In the Matter of the Application of MARY H. ATCHERLEY for a Writ of *Habeas Corpus* on behalf of JOHN ATCHERLEY.

### September 4, 1909.

*Territorial courts of Hawaii—Relation of Hawaiian Federal court to:* The status of the Hawaiian territorial courts and the relation between them and the Federal court in Hawaii is analogous to the status and relation of state courts to Federal district and circuit courts within the same territorial limits.

*Habeas corpus—Jurisdiction of Federal court:*   The Federal district and circuit courts have undoubted jurisdiction to summarily entertain petitions for the writ of *habeas corpus* in connection with persons alleged to be restrained of their liberty by the judgment of state or territorial courts or the action of state or territorial officials contrary to the rights of such persons under the Constitution and laws of the United States.

*Habeas corpus—Limitation of jurisdiction under established Supreme Court decisions:*   While such jurisdiction undoubtedly exists, the Supreme Court has strongly admonished inferior Federal courts that they must not interfere with the administration of justice in the state courts except in cases of "peculiar urgency."

*Habeas corpus—"Peculiar urgency":*   Cases of "peculiar urgency" justifying the interference of Federal courts by writs of *habeas corpus* with the administration of justice in the state courts (including territorial courts when the latter are, as in Hawaii, in the same position as state courts) are probably those cases, and only those cases, which involve, to the extent of prevention, embarrassment or retardation, the authority and operations of the general government, or its obligations and relations to foreign nations.

*Habeas corpus—Non-interference with administration of justice in state courts:*   By granting to the Federal courts power to act summarily upon the petitions for writs of *habeas corpus,* Congress did not intend that the Federal courts should by such action draw to themselves in the first instance the control of all criminal actions commenced in state courts where the accused claims that he is held in custody in violation of the Constitution of the United States, thus clogging the calendars of the Federal courts to an intolerable extent in an attempt to do work which can be done better by the state courts.

*Same:*   State courts are in duty bound, equally with the courts of the Union, to maintain the Constitution of the United States and it must be presumed that they are equally able and willing to support the Constitution.

*Same:*   The forbearance which courts of co-ordinate jurisdiction administered under a single system exercise towards each other, whereby conflicts are avoided by non-interference with the process of each other, is always a principle of comity, but between state courts and those of the United States it is something more.   It is a principle of right and of law, and therefore of necessity.

*Same:*   The correction of mistakes, if any, made by the state courts should be through writ of error and not by writ of *habeas corpus,* because otherwise one Federal judge might presume or feel in duty bound to reverse the decision of the highest court of a State; and thus, because the discharge of a prisoner in *habeas corpus* proceedings must be peremptory, would leave theoretically no method for the State to enforce its further or other legal remedy against the alleged wrongdoer, whereas the judgment upon a writ of error may, and should always, look toward such further proceedings in the lower courts as may be legally proper.

*Habeas corpus—Insane persons:*   A person adjudged insane is not

confined in an asylum as a matter of punishment, but for his own good and protection as much as for that of the State. Wherefore, in such cases, a Federal court should have still more hesitation about interfering with state officials than in case of persons charged with crime.

*Habeas corpus—State civil officers:* Comity between state and Federal courts most strongly demands that the latter shall under no circumstances look into the conduct of state civil officials either as to their motives or their official actions.

*T. M. Harrison,* Attorney for Petitioner.

*Lorrin Andrews,* Deputy Attorney General of the Territory, and *F. W. Milverton,* Assistant County Attorney, for Respondent, Dr. C. A. Peterson, Superintendent of the Insane Asylum.

WOODRUFF, J.　Dr. John Atcherley was examined, pronounced insane, and committed to the insane asylum under act 149, S. L. 1909, of the Territory of Hawaii. A petition for a writ of *habeas corpus* on his behalf was filed in this court by Mary H. Atcherley. For convenience, however, Dr. Atcherley will hereafter be mentioned as the petitioner. The petition is based upon the claim that act 149 is unconstitutional. Pursuant to the petition a writ of *habeas corpus* issued from this court, directed to Dr. C. A. Peterson, superintendent of the insane asylum of the Territory of Hawaii. His return thereto denied that act 149 is unconstitutional and set forth in detail the proceedings which caused Dr. Atcherley's commitment to the asylum, in order to show that, as a matter of fact, due process of law was had under the act. The petitioner filed no response to this return. Therefore the court must take it for granted that the facts set forth therein are substantially true.

At the beginning of the argument, counsel for the Territory moved to quash the writ of *habeas corpus* on the ground that the petitioner should pursue, in the territorial courts and by writ of error from the Supreme Court of the United States, the remedy sought in this court, and that this court has no jurisdiction to entertain the writ of *habeas corpus.* This motion to quash was overruled for the reason that the petition on its face

claims that Dr. Atcherley is restrained of his liberty contrary
to his rights under the Constitution of the United States; and
upon such a *prima facie* showing the Federal court has undoubt-
ed jurisdiction as shown by the many Supreme Court decisions
cited below.   It is true that the petition could have been con-
sidered without the issuance of the writ (*Ex parte Milligan,* 4
Wall. 2, syllabus, par. 4), under an order to show cause, but,
since the writ of *habeas corpus,* when once issued, can be dis-
missed after due hearing, it is within the discretion of the court
whether the hearing shall be upon an order to show cause or
upon the writ itself.

After dismissing the motion to quash, the court ruled that
the case involved three questions:

1.   Is the territorial act under which petitioner was com-
mitted, constitutional?
2.   If constitutional, was he as a matter of fact accorded
due process of law?
3.   Is this case of such "peculiar urgency" that this court
should interpose at this time, instead of leaving the petitioner
to his usual and final remedy in the territorial courts and,
through them, in the Supreme Court of the United States?

Counsel was informed that the third question would be taken
up first, and if it were decided in the negative the first and
second questions would not be considered.   This ruling is, I
believe, in direct compliance with frequently repeated decisions
of the Supreme Court of the United States.

Counsel for petitioner cited several cases in which Federal
courts did not compel petitioners to pursue their remedy through
the state courts, but released them summarily on the ground
that the laws under which they were restrained of their liberty
were unconstitutional or because they had not been accorded
due process of law.   Many of these cases, however, were not ap-
pealed from, and the Supreme Court has taken occasion to re-
verse lower Federal courts (*New York v. Eno,* 155 U. S. 89;
*Baker v. Grice,* 169 U. S. 284; *Minnesota v. Brundage,* 180
U. S. 179; *Urquhart v. Brown,* 205 U. S. 179) on the sole

ground that, instead of releasing under writs of *habeas corpus,* their duty was to leave the petitioners to their remedy in the state courts.

Counsel for petitioner then claimed that this is a case of "peculiar urgency" in the meaning of that expression as used in *Ex parte Royall* (117 U. S. 241, 251), in that it is a "such and like case of urgency," for the following reasons:

1.   There is no way for petitioner to be admitted to bail pending further action in the territorial courts and final decision in this matter.

2.   Petitioner has patients who especially desire and need his particular or peculiar treatment for leprosy.

3.   Petitioner has a contract for a year to treat certain lepers with a treatment at present known only to himself and not yet ready to be given to the medical profession.

4.   By his detention in the asylum, petitioner is prevented from practicing his profession and supporting his family.

5.   Petitioner is not receiving proper treatment in the insane asylum either as an inmate or as an invalid.

It seems clear that the Supreme Court has never wavered in its exposition of the fundamental principles governing the use of the writ of *habeas corpus* by Federal courts when the petitioners are restrained through operation of state laws. In the earlier cases, typified by *Ex parte Parks* (93 U. S. 18), and *In re Frederich* (149 U. S. 70, 76), and the cases therein cited, the Supreme Court lays special stress upon the fact that:

" It is only where the proceedings below are entirely void, either for want of jurisdiction or other cause, that such relief (by *habeas corpus*) will be given."

The Supreme Court has never receded from that view, as is clearly brought out in the recent case of *Kaizo v. Henry* (211 U. S. 146), where it is said (syllabus):

" No court may properly release a prisoner under conviction and sentence of another court unless for want of jurisdiction of cause or person, or some matter rendering the proceeding void."

Without losing sight of the fact that "want of jurisdiction of cause or person" is a fundamental principle, the Supreme Court, in cases from *Ex parte Royall* (117 U. S. 241) to *Urquhart v. Brown* (205 U. S. 179), has put forward with insistence a principle somewhat more easily applied, namely, that even when it is claimed that there was such want of jurisdiction, the correction of the mistake must be left to the state courts and finally through them to the Supreme Court of the United States "unless in cases of peculiar urgency."

My duty then, under orders from the Supreme Court, is to find from its decisions what exactly it means by "cases of peculiar urgency." In *Ex parte Royall, supra*, as repeated in *Whitten v. Tomlinson* (160 U. S. 231), *Tinsley v. Anderson* (171 U. S. 101, 105)., and *Minnesota v. Brundage* (180 U. S. 499, 501), the following cases are specifically set forth as containing some if not all of the principles intended by the Supreme Court to furnish the authoritative test of "peculiar urgency":

A. "When the petitioner is in custody by state authority for an act done or omitted to be done in pursuance of a law of the United States, or of an order, process or decree of a court or judge thereof." (*Ex parte Royall*, 251.)

B. "Where, being a subject or citizen of a foreign State, and domiciled therein, he is in custody, under like authority, for an act done or omitted under an alleged right, title, authority, privilege, protection or exemption claimed under the commission, or order or sanction of any foreign State, or under color thereof, the validity and effect whereof depend upon the law of nations." (Ibid. 251.)

C. "So, also, when they are in the custody of a state officer it may be necessary by use of the writ to bring them into a court of the United States to testify as witnesses." (Ibid. 252.)

The third principle (C) is certainly closely allied to the first (A), since both involve the authority and operations of the general government, while the second (B) involves the obligations of the general government to foreign nations.

Before touching briefly on my reasons for believing that the

principles of urgency indicated by the above examples ("A," " B " and " C ") exhaust the possibilities of legal "peculiar urgency," I feel constrained to examine certain additional items of urgency claimed by counsel for the petitioner. These items are enumerated in Rose's Code of Federal Procedure, Vol. 1, page 158, and the space occupied by their consideration *seriatim* must be excused, if excuse is necessary, by the fact that I find no full discussion of this phase of the *habeas corpus* question in any of the cases reported, and that petitioner bases his plea that this is a case of "peculiar urgency" on grounds analogous to those treated by Rose.

Rose declares that Federal courts will take into consideration and their decisions will be influenced by the following items of " peculiar urgency " :

1.   " By the ability of the accused to give bail and the reasonableness of the bail exacted.   (*Ex parte Royall,* 117 U. S. 241; *Baker v. Grice,* 169 U. S. 284; *In re Flinn,* 57 Fed. 496)."

The Supreme Court in the cases cited by Rose certainly refers in a negative way to the question of bail and petitioner's ability to pay it, but what is said is scarcely dictum, and gives no intimation that any amount of bail demanded, or absolute refusal to allow bail, or actual inability on the part of the petitioner to obtain security for bail, would be considered matter of " peculiar urgency," warranting interference with the course of justice in the state courts.   Why should not the Federal judge take it for granted that the state courts will deal lawfully and justly with defendants ?   The United States Supreme Court peremptorily (*Urquhart v. Brown,* 205 U. S. 179) indicates that judgment of release by a lower Federal court through a writ of *habeas corpus,* even when based on a finding that the state court did not accord due process of law to the defendant, will be reversed without consideration by the Supreme Court of whether the lower court did or did not reach a right conclusion on the law and facts.   The petitioner (Brown), being

restrained as insane like Dr. Atcherley, had no possibility of bail. The Supreme Court must have known that fact, and must be presumed to have considered it. The case was before the court, with the questions of the constitutionality of the law and whether or not due process of law had been accorded the petitioner definitely raised and ready for determination. Yet the Supreme Court returned the petitioner to the custody of the state officers, there to remain without bail in all human probability until a writ of error to the state court could be sued out, reached on the congested calendar of the Supreme Court, argued, and decided. Surely the unauthoritative and indefinite words cited from *Ex parte Royall* and *Baker v. Grice,* cannot be taken as so nearly expressing the views of the court as the irresistible implication of the peremptory order issued in *Urquhart v. Brown.* As for *In re Flinn* (57 Fed. 496), that case was not carried to the Supreme Court, and, moreover, has all the earmarks of being a mere suggestion to the state authorities that the law in question was unconstitutional, and that the Federal judge had every confidence that the state court would so hold at an early date, thus taking away any temptation for the Federal court to interfere. In other words, it was no decision of any kind and no later decision became necessary because the hint was taken and the petitioner released by the state authorities. Moreover, it is worthy of thought that the Supreme Court held that the Eighth Amendment, together with all other provisions of the Federal Constitution, which are not made expressly applicable to the States, applies to Federal and not to state legislation and procedure (*Pervear v. Commonwealth,* 5 Wall. 475), and for that reason any question concerning excessive bail demanded under state authority, is not within the jurisdiction of a Federal court; and, although the fact that Hawaii is a Territory and required by its organic act to conform its laws to the National Constitution, may bring the question of bail within the jurisdiction of this court in Dr. Atcherley's case, nevertheless there is no reason, and it would be improper, for this court to assume that the territorial judges

will not do promptly and fully their duty in regard to this and all matters.

2. " Failure to raise the constitutional question in, the State court. (*Davis v. Burke,* 179 U. S. 399; *Gusman v. Marrero,* 180 U. S. 81)."

Neither of the cases cited supports the contention that action by *habeas corpus* would be proper simply because the decision of the state court or inferior Federal court failed to pass on a Federal question which had not been raised, or which was not necessary to the decision reached. The implication is strongly to the contrary, and turning to page 292 of *Baker v. Grice* (169 U. S. 284), a case much in point overlooked by Rose, we find this question squarely raised and disposed of to the opposite effect from that suggested by Rose.

3. " The prospect of a speedy trial in the State court. (*Ex parte Royall,* 117 U. S. 241, 252)."

When it is said (*Ex parte Royall,* page 250) that "it is not alleged and it does not appear   *   *   *   that his trial will be unnecessarily delayed," the Supreme Court does not assert that Federal courts should ever look into promptitude or delay in cases pending before state courts. The allusion to delay seems to be an answer to verbal argument by counsel. It furnishes no more ground for than against Rose's contention. The whole trend of the many Supreme Court cases, especially *Ex parte Royall,* is that the lower Federal judges must (in common sense,—for the sake of comity,—and to avoid drawing to themselves an overwhelming mass of work more properly belonging to state courts) take it for granted that the state courts know what their duty is and will do it. No duty is more imperative than reasonably speedy trial, whether the Constitution specifically requires it or not. Moreover, Rose's contention must fall as far as the relation of Federal courts to state courts is concerned, because the Federal Constitution does not give accused persons the right of a speedy trial in a state court (*Baron v. Baltimore,* 7 Pet. 243). Whether or not the terri-

torial courts of Hawaii have given or will give a speedy trial to Dr. Atcherley must be left to their own conscience and judgment, and if they fail in that duty their correction must properly come in the first instance from higher territorial courts and finally from the Supreme Court of the United States.

4.   " The absence of remedy by appeal of one convicted of contempt.   (*Ex parte Stricker*, 109 U. S. 145)."

In the one case cited as supporting this item, the judge failed, as Rose did in his text-book, to note the earlier and unhesitating judgment on this point by the Chief Justice in *Pepke v. Cronan* (155 U. S. 100, 101) :

" It was insisted upon the argument that the judgment in contempt was not appealable; *State v. Davis*, 2 North Dakota 461; but it was conceded that the validity of the law and of the sentence could be tested by the Supreme Court of the State on *certiorari* or *habeas corpus, and no reason was suggested why, if the judgment of the district court was the final judgment of the highest court of the State in which a decision in the matter could be had, a writ of error from this court might not be applied for.*"

The restriction of this item by Rose to those convicted of contempt is unnecessary and misleading.   If it were possible, as seems not, that, in any case for contempt or otherwise involving a right under the Federal Constitution, proceedings in the state courts had reached a "final judgment of the highest court of the State in which a decision in the matter could be had," and there were no way of obtaining a review by the Supreme Court of the United States, then this item would, and must, be added to the list of cases of " peculiar urgency."

5.   " The fact that no Federal indictment has been made in cases where release is sought because the act is only an offense against the Federal government.   (*New York v. Eno*, 155 U. S. 89, 98; *In re Fox*, 51 Fed. 427)."

A careful examination of the cases cited shows that their holding is by strong implication to the contrary, and that it is not enough (see *Ex parte Fonda*, 117 U. S. 516, and *People v.*

*Fonda,* 62 Mich. 401) that the jurisdiction of the offense charged is exclusive in the Federal courts. State action must also affect, in the way of embarrassment, retardation or prevention, "the authority and operations of the general government" (*New York v. Eno,* 155 U. S. 96; *In re Loney,* 134 U. S. 372; *Wildenhuse's Case,* 120 U. S. 1; *In re Neagle,* 135 U. S. 1; *Ohio v. Thomas,* 173 U. S. 276; *Boske v. Comingore,* 177 U. S. 459; *In re Fox,* 51 Fed. 427). In other words, the case must come under the rules of "peculiar urgency" laid down in *Ex parte Royall* and quoted with approval in so many later decisions.

6. " Fact of want of diligence in the State courts. (*Minnesota v. Brundage,* 180 U. S. 499, 501)."

This item is so analogous to the one concerning speedy trial that we are not surprised, on turning to the specific case (*Minnesota v. Brundage*) relied on by Rose, to find its implication strongly against the item. The court there says (p. 503):

" It cannot be assumed that the state court will hesitate to enforce any rights secured to him [petitioner] by that instrument [the Constitution of the United States]; for upon them equally with the courts of the Union rests the duty to maintain the supreme law of the land. *Robb v. Connolly,* 111 U. S. 624, 637. If the state court declined to recognize the Federal right specially claimed by the accused, the case could be brought here for review."

What stronger implication that it would be improper for inferior Federal courts to look into motives, diligence, willingness, or ability of state courts to decide questions which are within their jurisdiction, and sought to be removed by *habeas corpus* to Federal courts?

7. " The fact that the statute under which the prosecution is founded, is admittedly valid. (*In re Wood,* 140 U. S. 278, 290)."

If Rose means by this item, as was decided in the case he cites, that the writ of *habeas corpus* will be dismissed for lack of " peculiar urgency," if the only claim set up is mal-admin-

istration of an admittedly constitutional law, he is right. But the converse is not hinted at in the case cited. In other words this item has little to do with the great question of what constitutes " peculiar urgency " except to narrow us more and more to the items "A," "B" and "C" quoted above from *Ex parte Royall.*

8. " The fact that an ordinance is plainly invalid. (*In re Ah Jow,* 29 Fed. 181; *In re Christensen,* 43 Fed. 243; *Ex parte Green,* 114 Fed. 959)."

The three cases cited by Rose in support of this item are not Supreme Court decisions, and he entirely overlooks the fact that *In re Christensen* was reversed by the Supreme Court (*Crowley v. Christensen,* 137 U. S. 88). This reversal, to be sure, was based upon the merits of the case, not on lack of " peculiar urgency," and may be properly classed with *Medley, Petitioner* (134 U. S. 160), *Minnesota v. Barber* (136 U. S. 313), etc., concerning which the Supreme Court has specifically said that probably its attention was not called to that point (*In re Frederich,* 149 U. S. 70, 78, and *Minnesota v. Brundage,* 180 U. S. 499, 504). In other words, there is no reason to believe that if its attention had been aroused, the Supreme Court would have specifically approved the addition of this item to those admitted to be of " peculiar urgency." That the circuit judge did not base his action on that ground is evidenced by the fact that he refused to issue the writ on an earlier petition, and that he finally acted on the petition solely on the ground that the California chief justice would not allow a writ of error and the Supreme Court justice presiding over the ninth circuit was in Europe. As for *In re Ah Jow,* and *Ex parte Green,* cited by Rose, they are not only decisions by inferior courts, but directly against and nullified by *Ex parte Royall* and subsequent Supreme Court cases. It is evident that the want of jurisdiction laid down as a reason for discharge of a petitioner cannot be based on the mere unconstitutionality of a state law. Otherwise such invalidity would become one of the

items of " peculiar urgency," and Federal courts would be compelled to consider on their merits each petition alleging unconstitutionality. This would subvert the rule. Indeed the Supreme Court has put this question at rest specifically in *Baker v. Grice* (169 U. S. 284). In that case, as in the cases cited by Rose, the lower court had discharged the petitioner on the ground that the state law was unconstitutional, but the Supreme Court, referring to the "peculiar urgency" principles of *Ex parte Royall,* reversed the lower court, saying (p. 294):

" Upon the facts appearing herein, we think no sufficient case was made out for the exercise of the jurisdiction of the circuit court. We come to this decision *irrespective of the question of the validity of the state statute* and without passing upon the same or expressing any opinion in regard thereto."

9. " The fact that the offense is plainly beyond the jurisdiction of the State. (*In re Loney,* 134 U. S. 372; *In re Ladd,* 74 Fed. 31; see *In re Bradley,* 96 Fed. 969, 970)."

This item would be one of " peculiar urgency " when, and only when, the alleged offense is not only beyond the jurisdiction of the State, but also affects the authority, operations, or obligations of the general government. Even then it need not be treated as a separate item, since it falls under "A" or "B" of the principles quoted above as laid down in *Ex parte Royall.* This is clearly brought out by the Supreme Court in the case of *In re Loney* (134 U. S. 372, 375):

" But the power of punishing a witness for testifying falsely in a judicial proceeding belongs peculiarly to the government in whose tribunals that proceeding is had. It is essential to the impartial and efficient administration of justice in the tribunals of the nation, that witnesses should be able to testify freely before them, unrestrained by legislation of the State, or by fear of punishment in the state courts. *The administration of justice in the national tribunals would be greatly embarrassed and impeded* if a witness testifying before a court of the United States, or upon a contested election of a member of Congress, were liable to prosecution and punishment in the courts of the State upon a charge of perjury, preferred by a

disappointed suitor or contestant, or instigated by local passion or prejudice."

The cases of *In re Ladd* and *In re Bradley,* cited by Rose, are conflicting as to the practical application of this item of " peculiar urgency " and show, if anything: First, how careful the Federal courts should be not to interfere with the administration of justice in the state courts; and, second, how, to constitute a "like case of urgency" and warrant interference, the want of jurisdiction of the state court must probably be one clearly "involving the authority and operations of the general government." *In re Ladd* might well have so operated since the action in the state court interfered, without jurisdiction, with the distribution and use of liquor on a military reservation, such use being sanctioned by, and thus made part of, the military discipline on the reservation. *In re Bradley,* on the contrary, did not involve directly "the authority and operations of the general government," and therefore the circuit court left the case to the state courts. If the petitioner in the latter case had been an official of the Soldiers' Home, charged with an alleged unwarranted assault made within the grounds of the home, ostensibly in the course of his official business, the circuit judge would have been in duty bound to consider his petition and discharge him, if the state court had no jurisdiction, and if "the authority and operations of the general government" were involved in such manner that they "would be greatly embarrassed and impeded."

10.  " The existence of doubt as to the alleged violation of the Federal Constitution.  (*Ex parte Hanson,* 28 Fed. 127)."

11.  " The fact that petitioner himself instigated the State proceedings against him.  (*In re Alexander,* 84 Fed. 633)."

Rose supports the last two items by decisions of lower courts only. They are not items of "peculiar urgency" but merely considerations which would have weight in case sufficiently urgent reason should be found to warrant the court in taking up the merits of the case.

In fact the items mentioned by Rose and discussed above should have, with the exception of some phases of item number 9, been introduced by substituting for his introductory words (page 158) which read: "In deciding whether a particular case is so urgent as to demand the exercise of this summary power, before and after trial, the Federal court will take into consideration and its decision will be influenced," etc., the following clause, which would have been practically true:

If the Federal court has decided that a particular case is one of "peculiar urgency," under the principles laid down in *Ex parte Royall* and later decisions of the Supreme Court, it will take into consideration and its decision *on the merits of the case* will be influenced by the following, etc.

This brings us back to the question of what the Supreme Court undoubtedly means to be the only fundamental principles of "peculiar urgency," which would warrant the lower Federal courts in taking up the consideration of a writ of *habeas corpus* on its merits. It will be noted that in *Ex parte Royall,* from which the three undisputed items quoted above ("A," "B" and "C") were taken, the court, after declaring "A" and "B," says (pp. 251, 252): "In such and like cases of urgency, *involving the authority and operations of the general government, or the obligations of this country to, or its relations with, foreign nations,* the courts of the United States have frequently interposed by writs of *habeas corpus* and discharged prisoners who were held in custody under state authority"; and when in later decisions the same matter is touched upon we find significant additional expressions.

Thus, in *New York v. Eno* (155 U. S. 89, 97), the Supreme Court, in reversing the circuit court for considering the merits of the case and discharging the prisoner, decides that the case was not one of "peculiar urgency" under the rules in *Ex parte Royall,* and, in distinguishing the case of *In re Loney* (134 U. S. 372), uses the significant words (p. 97):

"It is clear from its statement that that case [In re Loney]

was one of urgency, *involving in a substantial sense the authority and operations of the general government."*

Again, in *Whitten v. Tomlinson* (160 U. S. 231, 240, 241, 242), the Supreme Court, besides quoting the principles in *Ex parte Royall* with approval, shows how the cases of *In re Neagle* (135 U. S. 1), *In re Loney* (134 U. S. 372), and *Wildenhuse's Case* (120 U. S. 1), fall under those principles; and brings out their qualified scope and limitation by the words (p. 241):

" It was recognized that in cases of urgency   *   *   *   *   *   *   *involving the authority and operations of the general government, or its relations to foreign nations,* the courts of the United States should interpose by writ of *habeas corpus.*   *   *   *   *   *   *But* (p. 242), except in *such* peculiar and urgent cases, the courts of the United States will not discharge the prisoner by *habeas corpus* in advance of a final determination of his case in the courts of the State; and, even after such final determination in those courts, will generally leave the petitioner to the usual and orderly course of proceeding by writ of error from this court."

Note that by the use of the word *"but"* (p. 242) the court connects the word *"such"* with the previous part of the above quotation,  otherwise apparently disconnected  by nearly the space of a page, and thereby shows that " peculiar and urgent cases " must be those and only those involving the authority and operations, or obligations of the general government.  Also in *Ex parte Royall* as quoted above, *"such and like"* (p. 251) as italicised by me, qualify not the abstract idea of *"urgency"* but the specific idea that the general government is definitely involved or affected.

In *Baker v. Grice* (169 U. S. 284), the Supreme Court says (p. 291): "Cases have occurred of so exceptional a nature that this course [interference with the state courts by writ of *habeas corpus*] has been pursued," illustrating the meaning of " exceptional nature" by the cases of *In re Loney* and *In re Neagle* mentioned above, and clearly shown by the court to be cases

directly "involving the authority and operations of the general government."

In *Minnesota v. Brundage* (180 U. S. 499), the Supreme Court quotes the principles laid down in *Ex parte Royall* at length, exemplifying the meaning of " peculiar urgency " by a number of cases all involving the "authority, operations or obligations of the general government," namely, *In re Loney* (134 U. S. 372, 375), *Ohio v. Thomas* (173 U. S. 276, 284-285), and *Boske v. Comingore* (177 U. S. 459, 466-467).

In *Urquhart v. Brown* (205 U. S. 179), a case in many respects similar to the one now under consideration in this court, Mr. Justice Harlan said (p. 182):

" The exceptional cases in which a Federal court or judge may sometimes appropriately interfere by *habeas corpus* in advance of final action by the authorities of the State are those of great urgency that require to be promptly disposed of, such, for instance, as cases *'involving the authority and operations of the general government, or the obligations of this country to, or its relations with, foreign nations'.*"

The above expressions of the Supreme Court, to which many more might be added, should be read with special attention to the italics, inserted for the purposes of this decision. The mistake made by Rose in his Federal Procedure, by counsel for the petitioner in this case, and by some Federal judges who were either reversed by the Supreme Court or whose decisions did not reach that tribunal, is based upon a failure to grasp fully the significance of the words "such" and "like," as used in apparent recognition of the existence of further cases of " peculiar urgency." These words evidently and properly are not used as referring to the adjectives "peculiar" and "urgent," or to the idea of "urgency," but rather to the phrase "involving the authority and operations of the general government or its relations to foreign nations." The Supreme Court wisely intimates in this way that its list of such cases given in *Ex parte Royall,* namely, those involving the authority, operations, or obligations of the general government, may not be

complete, and therefore authorizes the lower courts to entertain writs of *habeas corpus* in any such and like cases which have been overlooked or not covered by the list of *Ex parte Royall.* Thus the Supreme Court, in running over that list of items ("A," "B" and "C") in other cases, often forgets to include the third ("C"), namely, the one referring to the issuance of the writ of *habeas corpus ad testificandum,* which is clearly a "like" case.

I venture confidently to paraphrase the principle upon which all cases of "peculiar urgency" must depend as follows:

The Federal courts should never interfere by writ of *habeas corpus* with the administration of justice in the state courts (including territorial courts when the latter are, as in Hawaii, in the same position as state courts) except in cases involving the authority and operations of the general government, or its obligations and relations to foreign nations, and, even then, only because of peculiar urgency.

That this restriction of the words "peculiar urgency" to cases involving the authority, operations and obligations of the general government is the one intended by the Supreme Court, is shown more clearly by its more extended explanation of why there should not be interference with the state courts, than by its discussion of what "peculiar urgency" means. These authoritative expositions of the principle of non-interference are found in the same cases and in direct juxtaposition with the otherwise somewhat obscure declaration of the principle of "peculiar urgency," and, I believe, remove all doubt concerning whether the above paraphrase is correct.

Thus, in *Ex parte Royall* (pp. 251, 252), the Supreme Court declares as its reasons for the "peculiar urgency" rule:

"We cannot suppose that Congress intended to compel those courts, by such means, to draw to themselves, in the first instance, the control of all criminal prosecutions commenced in state courts exercising authority within the same territorial limits, where the accused claims that he is held in custody in violation of the Constitution of the United States. The in-

junction to hear the case summarily, and thereupon 'to dispose of the party as law and justice require' does not deprive the court of discretion as to the time and mode in which it will exert the powers conferred upon it.    That discretion should be exercised in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution.    *    *    *    The present cases involve no such considerations [of the authority, operations or obligations of the general government].    Nor do their circumstances, as detailed in the petitions, suggest any reason why the state court of original jurisdiction may not, without interference on the part of the courts of the United States, pass upon the question which is raised as to the constitutionality of the statutes under which the appellant is indicted. The circuit court *was not at liberty,* under the circumstances disclosed, to presume that the decision of the state court would be otherwise than is required by the fundamental law of the land, or that it would disregard the settled principles of constitutional law announced by this court, upon which is clearly conferred the power to decide ultimately and finally all cases arising under the Constitution and laws of the United States. In *Taylor v. Carryl,* 20 How. 583, 595, it was said to be a recognized portion of the duty of this court,—and, we will add, of all courts, national and state,—'to give preference to such principles and methods of procedure as shall serve to conciliate the distinct and independent tribunals of the States and of the Union, so that they may cooperate as harmonious members of a judicial system coextensive with the United States, and submitting to the paramount authority of the same Constitution, laws, and Federal obligations.'    And in *Covell v. Heyman,* 111 U. S. 176, 182, it was declared 'that the forbearance which courts of co-ordinate jurisdiction, administered under a single system, exercise toward each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity, with perhaps no higher sanction than the utility which comes from concord; but between state courts and those of the United States it is something more.    It is a principle of right and of law, and, *therefore, of necessity'.*"

In the case of *In re Wood* (140 U. S. 278, 289), the court says, as introduction to an approving quotation of the principles in *Ex parte Royall*:

"It was not intended by Congress that they [the Federal courts] should by writs of *habeas corpus* obstruct the ordinary administration of the criminal laws of the States, through their own tribunals."

In the case of *In re Frederich* (149 U. S. 70, 77-78), the Supreme Court adds to the reasons expressed in the earlier cases another and strong ground for not interfering with the state courts, and apologizes for an interference of that kind in *Medley, Petitioner*, where the Supreme Court itself had departed from its usual and wise rule:

"We adhere to the views expressed in that case [*Ex parte Royall*]. It is certainly the better practice, in cases of this kind, to put the prisoner to his remedy by writ of error from this court, under section 709 of the Revised Statutes, than to award him a writ of *habeas corpus*. For, under proceedings by writ of error, the validity of the judgment against him can be called in question, and the Federal court left in a position to correct the wrong, if any, done the petitioner, and at the same time leave the state authorities in a position to deal with him thereafter, within the limits of proper authority, instead of discharging him by *habeas corpus* proceedings, and thereby depriving the State of the opportunity of asserting further jurisdiction over his person in respect to the crime with which he is charged.

"In some instances, as in *Medley, Petitioner*, 134 U. S. 160, the proceeding by *habeas corpus* has been entertained, although a writ of error could be prosecuted; but *the general rule and better practice*, in the absence of special facts and circumstances, is to require a prisoner who claims that the judgment of a state court violates his rights under the Constitution or laws of the United States, to seek a review thereof by writ of error instead of resorting to the writ of *habeas corpus*."

Again, in *New York v. Eno* (155 U. S. 89, 93, 94, 95), the court expresses full satisfaction with the principles of *Ex parte Royall* set forth above, and adds (p. 95):

" Of course, the discretion here referred to is a legal discretion to be controlled in its exercise by such principles as are applicable to the particular case in hand."

In *Whitten v. Tomlinson* (160 U. S. 231, 240, 241, 242), the court again refers with unqualified approval to the principles of *Ex parte Royall,* as repeated in the case of *New York v. Eno,* without attempting to enlarge further upon the principle of non-interference, but showing carefully the propriety of several Supreme Court decisions directly in accord with those principles.

In *Baker v. Grice* (169 U. S. 290, 291), these principles are approved and repeated in a new form but with the same meaning:

" From these cases [*Ex parte Royall* and *Whitten v. Tomlinson*] it clearly appears, as the settled and proper procedure, that while circuit courts of the United States have jurisdiction, under the circumstances set forth in the foregoing statement, to issue the writ of *habeas corpus,* yet those courts ought not to exercise that jurisdiction by the discharge of a prisoner unless in cases of peculiar urgency, and that instead of discharging they will leave the prisoner to be dealt with by the courts of the State; that after a final determination of the case by the state court, the Federal courts will even then generally leave the petitioner to his remedy by writ of error from this court. The reason for this course is apparent. It is an exceedingly delicate jurisdiction given to the Federal courts by which a person under an indictment in a state court and subject to its laws may, by the decision of a single judge of the Federal court, upon a writ of *habeas corpus,* be taken out of the custody of the officers of the State and finally discharged therefrom, and thus a trial by the state courts of an indictment found under the laws of a State be finally prevented. Cases have occurred of so exceptional a nature that this course has been pursued. Such are the cases *In re Loney,* 134 U. S. 372, and *In re Neagle,* 135 U. S. 1, but the reasons for the interference of the Federal court in each of those cases were extraordinary, and presented what this court regarded as such exceptional facts as to justify the interference of the Federal tribunal. Unless this case be of such an exceptional nature, we

ought not to encourage the interference of the Federal court below with the regular course of justice in the state court."

Again, in *Tinsley v. Anderson* (171 U. S. 101, 104, 105), the court, briefly and with approval, reviews previous decisions on this point:

" The dismissal by the circuit court of the United States of its own writ of *habeas corpus* was in accordance with the rule, repeatedly laid down by this court, that the circuit courts of the United States, while they have power to grant writs of *habeas corpus* for the purpose of inquiring into the cause of restraint of liberty of any person in custody under the authority of a State in violation of the Constitution, a law or a treaty of the United States, yet, except in cases of peculiar urgency, ought not to exercise that jurisdiction by a discharge of the person in advance of a final determination of his case in the courts of the State, and, even after such final determination, will leave him to his remedy to review it by writ of error from this court. *Ex parte Royall,* 117 U. S. 241; *Ex parte Fonda,* 117 U. S. 516; *In re Frederich,* 149 U. S. 70; *Pepke v. Cronan,* 155 U. S. 100; *Bergemann v. Backer,* 157 U. S. 655; *Whitten v. Tomlinson,* 160 U. S. 231; *Baker v. Grice,* 169 U. S. 284."

In *Markuson v. Boucher* (175 U. S. 184, 185-187), the court repeats in new form the point in question, after referring with approval to the long list of earlier decisions:

" The jurisdiction is more delicate, the reason against its exercise stronger, when a single judge is invoked to reverse the decision of the highest court of a State in which the constitutional rights of a prisoner could have been claimed and may be were rightly decided, or if not rightly decided, could be reviewed and redressed by a writ of error from this court."

In *Minnesota v. Brundage* (180 U. S. 499, 500-503), the court adds to its approval of the decisions in the ever-growing list of earlier cases, which it cites *in extenso,* the following significant thoughts:

" This question is one of great importance, but we do not

deem it necessary now to consider it; for in our opinion the circuit court should have denied the application for the writ of *habeas corpus,* without prejudice to a renewal of the same after the accused had availed himself of such remedies as the laws of the State afforded for a review of the judgment in the state court of which he complains (pp. 500-501).

" The present case does not come within any of the exceptions to the general rule announced in the cases above cited. It is not, in any legal view, one of urgency. The accused does not, in his application, state any reason why he should not be required to bring the question involved in the prosecution against him before a higher court of the State and invoke its power to discharge him if in its judgment he is restrained of his liberty in violation of the Constitution of the United States. It can not to be assumed that the state court will hesitate to enforce any rights secured to him by that instrument; for upon them equally with the courts of the Union rests the duty to maintain the supreme law of the land. *Robb v. Connolly,* 111 U. S. 624, 637. If the state court declined to recognize the Federal right specially claimed by the accused, the case could be brought here for review (p. 503).

" Among the cases cited in support of the action of the circuit court are *Minnesota v. Barber,* 136 U. S. 313, and *Plumley v. Massachusetts,* 155 U. S. 461. It must be admitted that in the first named case the general rule announced in prior and subsequent cases was not applied. The reason for not then applying it does not appear from the opinion of the court. It may be that the precise point now under examination was not called to its attention. *Plumley v. Massachusetts* is not in point, for it came to this court upon writ of error to the highest court of Massachusetts" (p. 504).

The Supreme Court, as shown by the last paragraph quoted above, had inadvertently acted upon a writ of *habeas corpus* in a very similar proceeding (*Minnesota v. Barber,* 136 U. S. 313), and in spite of that fact not only refuses to consider the merits of this case (*Minnesota v. Brundage*), but goes to the extent of reversing the lower court upon the ground that "the case * * * is not one of urgency *within the meaning of our decisions."* The lower court had decided the case under

the same misapprehension concerning "peculiar urgency" exemplified by the items from Rose's Federal Procedure discussed above, and by contention of counsel in this case. The Supreme Court says:

"Nor do we think that the circuit court should have interfered with the custody of the appellee because in its opinion the action of the municipal court of Minneapolis was inconsistent with the judgments of this court in the *Schollenberger* and *Collins* cases. Upon that question the state court was entitled to form its own opinion, and give judgment accordingly. Whether, in view of the judgments in the *Schollenberger* and *Collins* cases, the state court should have held the Minnesota statute to be repugnant to the Constitution of the United States, it is not necessary now to say. Besides the record does not show that the attention of the municipal court of Minneapolis was called to those cases; much less is there any reason to suppose that it deliberately refused to accept the decisions of this court as controlling upon questions arising under the Constitution of the United States. As disclosed by the record, the case, we repeat, *is not one of urgency within the meaning of our decisions,* and does not suggest any adequate reason why the appellee should not be required, before applying to the circuit court of the United States to be discharged upon *habeas corpus,* to seek at the hands of the higher courts of the State a reversal of the judgment rendered against him in the municipal court of Minneapolis."

In *Drury v. Lewis* (200 U. S. 1, 8), it is said:

"We have repeatedly held that the acts of Congress in relation to *habeas corpus* do not imperatively require the circuit courts to wrest petitioners from the custody of state officers in advance of trial in the state courts, and that those courts may decline to discharge in the proper exercise of discretion. We think that discretion was properly exercised in this case."

Although the petitioner, Lieutenant Drury, was arrested and held by the state courts for an act done in the alleged discharge of his duty as an officer of the United States, thus involving the operations and authority of the general government, the court carries the principle of non-interference so far that it

leaves to the state tribunal rather than to action by *habeas corpus* the determination of whether Drury and his subordinate Dowd were or were not guilty of murder for the killing of Crowley in the alleged fulfilment of their duty as Federal officers. It is possible that if the circuit court had exercised its discretionary power by deciding this to be a case of "peculiar urgency," the Supreme Court would not have reversed its judgment, although the latter says (p. 8):

" But there was a conflict of evidence as to whether Crowley had or had not surrendered, and it is conceded that if he had, it could not reasonably be claimed that the fatal shot was fired *in the performance of a duty imposed by the Federal law,* and the state court had jurisdiction."

Finally, in *Urquhart v. Brown* (205 U. S. 179, 181, 182-183), the Supreme Court reversed the circuit court for taking up the merits of a petition for writ of *habeas corpus,* on the ground that the merits of the case should not be considered in *habeas corpus* proceedings, but that (p. 182):

" The present case is not within any of the exceptions recognized in our former decisions. If the applicant felt that the decision, upon *habeas corpus,* in the Supreme Court of the State was in violation of his rights under the Constitution or laws of the United States, he could have brought the case by writ of error directly from that court to this court."

In the light of these authoritative expressions of the principle of non-interference, it is evident that the above attempt at a paraphrase of the meaning of the Supreme Court concerning cases of "peculiar urgency," was correct; and was properly based in general on the legality and propriety of the principle of non-interference which, in turn, might be correctly paraphrased as follows:

In disposing of cases coming before it, a state court has equally with a Federal court the power and duty of construing the Federal Constitution and laws, and of fully protecting all litigants and claimants in their rights under the Federal Constitution and laws.

Each Federal court has undoubted jurisdiction to take under consideration any petition for writ of *habeas corpus* based on a claim that a person is deprived of his liberty contrary to his rights under the Federal Constitution and laws, and to set such petitioner at liberty if the court believes he is thus unlawfully restrained of his liberty.

But this power is such a delicate matter that it should never be used except in cases involving the authority, operations or obligations of the general government. Otherwise the Federal courts would assume that they are more fitted or inclined to do their duty than the judges of the state courts are, thus belittling or impeaching the state judges rather than securing to petitioners their constitutional rights; and would draw upon themselves the insuperable burden of acting on a multitude of petitions for the writ of *habeas corpus,* the merits of which can be more properly and better considered in the state courts, thus unnecessarily endangering that good feeling and comity which must be cherished between the Federal and state courts sitting within the same territorial limits.

By following out the above principles of non-interference, no Federal legal, or constitutional right can be lost to any person and the course of justice will run along lines intended by Congress, since the state courts will reach proper conclusions, or, if not, can be corrected by the Supreme Court of the United States through writ of error directed to "the highest court of the State in which a decision in the matter could be had."

In other words, the Federal courts must not interfere with the state courts, except when procedure in the latter involves or affects materially the general government by interfering with its reasonable performance of its functions, the necessary exercise of its authority, or the fulfilment of its obligations.

The case of Dr. Atcherley now before this court is eminently one to be decided under the above principles. Petitioner, as an adjudged insane person, is not *prima facie* being punished, but, on the contrary, being properly protected and cared for as a ward of the Territory; unless, indeed, the territorial officials are wrong in the morals of their attitude toward petitioner, or in the facts concerning his sanity, as found and applied by them. None of the reasons for "peculiar urgency" set forth by

his counsel and leading to the above exhaustive examination of cases, comes within the principles of *Ex parte Royall* as paraphrased above to show clearly the intent of the Supreme Court. This court will not, and cannot, entertain for a moment the thought, or attempt to act upon the view, that either one or many of the territorial officials are prompted by improper motives or carelessness in the restraint of the petitioner as an insane person. Even if that were true, it is not the province of this court, in law or common sense, to attempt to impeach or correct them. The petitioner's remedy is and must be through the territorial courts which, in Hawaii, sustain the same relation to this court as that held by state courts to Federal circuit and district courts (*Wilder's S. S. Co. v. Hind, et al.,* 108 Fed. 113; sec. 86, act of April 30, 1900, 31 Stat. 141). The territorial judges and officials are more directly interested than this court in finding out whether the law in question is or is not constitutional, and in giving due process of law to the people of Hawaii in this and all cases.

But, granting I am wrong in believing that "peculiar urgency" belongs always and only to cases which interfere with the general government, even then the Supreme Court decisions, in specific words or by necessary implication, show that the alleged grounds of urgency advanced by counsel, do not warrant further action by this court. Thus *Urquhart v. Brown,* by remanding an alleged insane person, disposes of the bail question. Pages 504 and 505 of *Minnesota v. Brundage* dispose of the question whether the indirect and uncertain interest of the public in petitioner's alleged special treatment of leprosy is a matter of legal "urgency." *Markuson v. Boucher* shows that "straightened circumstances" affecting, as it always must, petitioner's ability to prosecute his case, support his family, etc., is not a legal ground for interference. And all the cases cited in this decision prohibit Federal courts from inquiring into the good faith of state officials, as for instance whether they are treating their insane properly.

In *Urquhart v. Brown,* the petitioner was restrained of his

liberty on the ground of insanity and as far as the record shows had no way of obtaining a release on bail to await the determination of his suit. Dr. Atcherley's case is, as urged by counsel, in that and many respects analogous to *Urquhart v. Brown,* and if this court should presume to consider the petition on its merits, and, as seems unlikely in view of the recent decision of the Supreme Court of the Territory (*In re Atcherley,* 19 Haw. 535), should determine the law to be unconstitutional, the Supreme Court, upon writ of error, would refuse to look into the propriety of such judgment, and would reverse this court as summarily as in *Urquhart v. Brown,* thereby administering a proper rebuke for disregard of its often repeated directions concerning non-interference by writ of *habeas corpus.* Thus, petitioner, after great delay and expense, would be left quite as far as ever from an authoritative determination of his claim that he is legally entitled to be set at liberty.

Let the writ of *habeas corpus* be dismissed, and Dr. Atcherley remanded to the custody of the Territory.