## OHIO *v.* THOMAS.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 353. Argued and submitted January 10, 1899. — Decided February 27, 1899.

In making provision for feeding the inmates of the soldiers' home in Ohio, in accordance with the legislation of Congress in that respect, and under the direction of the board of managers, the governor of the house is engaged in the internal administration of a Federal institution, and the state legislature has no constitutional power to interfere with the management which is provided for it by Congress, nor with the provisions made by Congress for furnishing food to the inmates, nor does the police power of the State enable it to prohibit or regulate the furnishing of any

article of food approved by the officers of the home, by the board of man-
agers and by Congress.

Federal officers who are discharging their duties in a State, and who are
engaged in superintending the internal government and management of
a Federal institution, under the lawful direction of its board of managers
and with the approval of Congress, are not subject to the jurisdiction of
the State in regard to those very matters of administration which are
thus approved by Federal authority.

This is one of the cases in which it is proper to issue a writ of *habeas corpus*
from the Federal court under the rule as stated in *Ex parte Royall*, 117
U. S. 241, instead of awaiting the slow process of a writ of error from
this court to the highest court of the State where the decision could
be had.

In this case complaint was made by affidavit by the dairy
commissioner of Ohio against the appellee, alleging that on
March 2, 1897, he violated the act of the legislature of the
State of Ohio, passed in 1895, (92 Ohio State Laws, 23,) in
relation to the use of oleomargarine. Appellee was arrested
and brought before a justice of the peace, and declined to plead
to the charge on the ground that the act complained of in the
affidavit of the complainant was performed by him as governor
of the soldiers' home, located in the county of Montgomery in
the State of Ohio, and what he did was done by the authority
of the board of managers of the home. He therefore moved
to dismiss the complaint for want of jurisdiction in the magis-
trate. This motion was denied. He then consented to be tried
without a jury upon the following agreed statement of facts :

" 1. That on the 2d day of March, 1897, Joseph E. Black-
burn was and now is the food and dairy commissioner of the
State of Ohio.

" 2. That on the 2d day of March, 1897, J. B. Thomas was
and now is the duly chosen and acting governor of the Cen-
tral Branch of the National Home for Disabled Volunteer
Soldiers, located in the county of Montgomery, State of Ohio,
and as said governor was in charge of the eating house at the
said Central Branch of the National Home for Disabled Vol-
unteer Soldiers.

" 3. Said eating house is used by said J. B. Thomas for serv-
ing and furnishing to the inmates of said Central Branch of
the National Home for Disabled Volunteer Soldiers their daily

food or rations, and is the only place so provided at said National Home, and is known as the mess room of the said Central Branch of the National Home for Disabled Volunteer Soldiers, situate on the grounds purchased, held and used by the United States therefor, and the acts complained of herein consisted in causing oleomargarine to be served and furnished, on the 2d day of March, 1897, as food and as part of the rations furnished to the inmates thereof, under appropriations made by the Congress of the United States for the support of said inmates; and that no placard in size not less than 10 x 14 inches, having printed thereon in black letters not less in size than $1\frac{1}{2}$ inches square, the words 'oleomargarine sold and used here,' was displayed in said eating house.

"4. The affidavit in the cause is made in conformity with an act of the general assembly of the State of Ohio, (Ohio Laws, vol. 92, p. 23,) passed in 1895, and entitled 'An act to amend section 3 of an act entitled "An act to prevent fraud and deception in the manufacture and sale of oleomargarine and promote public health in the State of Ohio,"' passed May 16, 1894."

Section 3 of the act, as so amended, reads as follows:

"Sec. 3. Every proprietor, keeper, manager or person in charge of any hotel, boat, railroad car, boarding house, restaurant, eating house, lunch counter or lunch room, who therein sells, uses, serves, furnishes or disposes of or uses in cooking, any oleomargarine, shall display and keep a white placard in a conspicuous place, where the same may be easily seen and read, in the dining room, eating house, restaurant, lunch room or place where such substance is furnished, served, sold or disposed of, which placard shall be in size not less than ten by fourteen inches, upon which shall be printed in black letters, not less in size than one and a half inches square, the words 'oleomargarine sold and used here,' and said card shall not contain any other words than the ones above described; and such proprietor, keeper, manager or person in charge shall not sell, serve or dispose of such substance as or for butter when butter is asked for or purported to be furnished or served."

In addition to the above statement, reference was made to

the following acts of Congress, providing for the creation and government of the National Homes for Disabled Volunteer Soldiers, viz.: act of March 3, 1865, c. 91, 13 Stat. 509; act of March 21, 1866, c. 21, 14 Stat. 10; act of March 3, 1875, c. 129, 18 Stat. 343, 359. By the last cited statute, on page 359, it is made the duty of the managers of the home, on or before the first day of August in each year, "to furnish to the Secretary of War estimates, in detail, for the support of said home for the fiscal year commencing on the first day of July thereafter; and the Secretary of War shall annually include such estimates in his estimates for his Department. And no moneys shall, after the first day of April, 1875, be drawn from the Treasury for the use of said home, except in pursuance of quarterly estimates, and upon quarterly requisitions by the managers thereof upon the Secretary of War, based upon such quarterly estimates, for the support of said home, for not more than three months next succeeding such requisition. . . . And the managers of said home shall, at the commencement of each quarter of the year, render the Secretary of War an account of all their receipts and expenditures for the quarter immediately preceding, with vouchers for such expenditures; and all such accounts and vouchers shall be authenticated by the officers of said home thereunto duly appointed by said managers, and audited and allowed as required by law for the general appropriations and expenditures of the War Department."

By the act approved August 4, 1886, c. 902, 24 Stat. 222, 251, it was also provided that "hereafter the estimates for the support of the Home for Disabled Volunteer Soldiers shall be submitted by items." Also by the act approved October 2, 1888, c. 1069, 25 Stat. 505, 543, it was "*Provided further*, That it shall be the duty of the managers of said home, on or before the first day of October, in each year, to furnish to the Secretary of War estimates, in detail, for the support of said home for the fiscal year commencing on the first day of July thereafter, and the Secretary of War shall annually include such estimates in his estimates for his department." Also by the act approved June 11, 1896, c. 420, 29

Stat. 413, 445, an appropriation was made for the support of the home at Dayton, Ohio, and for "the cost of all articles purchased for the regular ration, their freight, preparation and serving."

The material portions of the acts of March 3, 1865, and March 21, 1866, have been enacted in the Revised Statutes of the United States, being sections 4825 to 4837, both inclusive.

On the third of April, 1867, the legislature of the State of Ohio passed an act ceding jurisdiction to the United States over the lands and their appurtenances within the State of Ohio which might be acquired by donation or purchase by the managers of the National Asylum for Disabled Volunteer Soldiers within the State of Ohio, for the uses and purposes of the asylum.

By the act, approved January 21, 1871, c. 25, 16 Stat. 399, Congress ceded back to the State of Ohio jurisdiction over the place named, and relinquished such jurisdiction on the part of the United States, and the act contained the following: "And the United States shall claim or exercise no jurisdiction over said place after the passage of this act: *Provided*, That nothing contained in this act shall be construed to impair the powers and rights heretofore conferred upon the board of managers of the National Asylum for Disabled Volunteer Soldiers, incorporated under said act, in and over said territory."

Upon these facts the appellee was convicted by the magistrate before whom he was tried, and was sentenced to pay a fine of $50, and to be imprisoned until such fine was paid. He refused to pay the fine, and applied to the Circuit Court of the United States for the Southern District of Ohio, Western Division, for a writ of *habeas corpus*, on the ground that the state tribunal before which he was tried had no jurisdiction to try him. The writ was granted and the constable made return thereto, setting up that he held appellee under the mittimus from the justice of the peace before whom he was tried. Upon the hearing the court made an order discharging appellee. 58 U. S. App. 431. The State appealed from that order to the Circuit Court of Appeals for the Sixth

Circuit, where it was affirmed, (87 Fed. Rep. 453,) and the State then appealed to this court.

*Mr. Charles H. Bosler* and *Mr. Otto J. Renner*, for plaintiff in error, submitted on their brief.

*Mr. Judson Harmon* for defendant in error. *Mr. D. W. Bowman* was on his brief.

Mr. Justice Peckham, after stating the facts, delivered the opinion of the court.

The act of the legislature of the State of Ohio, passed May 16, 1868, ceding jurisdiction to the United States, if it had remained in force, would have prevented the state officials from taking jurisdiction in this case. Congress, however, by the act of January 21, 1871, ceded back and relinquished the jurisdiction that had been granted, and provided that it would claim or exercise no jurisdiction thereafter, except as therein mentioned.

If we assume, what the state court decided, that the provisions of the state statute relating to the sale of oleomargarine were intended to apply to and cover the soldiers' home, the question then arises whether the State had the power to legislate so as to control the governor of the home, acting under the direction of the board of managers and by the authority of Congress, in regard to the internal administration of the affairs of the home and in respect to the conditions upon which an article of food might be provided by the governor under such directions and authority.

The home is a Federal creation, and is under the direct and sole jurisdiction of Congress. The board of managers have certain powers granted them, Rev. Stat. § 4825, and among other things to make by-laws, rules and regulations not inconsistent with law for carrying on the business and government of the home.

The persons entitled to the benefits of the home are " officers and soldiers who served in the late war for the suppression of the rebellion," and also other soldiers and sailors. The inmates

are subject to the rules and articles of war, the same as if they were in the army. Rev. Stat. §§ 4832, 4835.

Under the statutes above cited, in which it is provided that the board of managers shall furnish to the Secretary of War, in each year, estimates, in detail, for the support of the home for the succeeding fiscal year, it would naturally be the duty of the governor of each home, in order to enable the board of managers to perform their own duty, to report to the board the same kind of detailed estimates that the board is by law directed to report to the Secretary of War, and which are to be included by the Secretary in the estimates for his department. At all events, the duty is laid upon the board of managers, by the very terms of the statute, to make these estimates in detail. It is admitted in the record that the oleomargarine complained about herein was served and furnished by the appellee as food and as part of the rations furnished the inmates under the appropriations made by Congress for the support of such inmates.

From these facts the inference is plain that oleomargarine had been included in the detailed estimates for rations to be furnished the inmates, and that the appropriation for rations included oleomargarine as part thereof. Otherwise we should have to infer a dereliction of duty on the part of the board of managers in not making out estimates in detail, and we would adopt an inference contrary to the admission, which states that the oleomargarine was furnished as food under an appropriation of Congress. The appropriation does not precede the detailed estimates, but is made subsequently and is presumably enacted with reference thereto. Congress has therefore in effect provided oleomargarine as part of the rations for the inmates of the home. It is given them in the mess room of the institution and under the rules and regulations for feeding them there. In making provision for so feeding the inmates, the governor, under the direction of the board of managers and with the assent and approval of Congress, is engaged in the internal administration of a Federal institution, and we think a state legislature has no constitutional power to interfere with such management as is provided by Congress.

Whatever jurisdiction the State may have over the place or ground where the institution is located, it can have none to interfere with the provision made by Congress for furnishing food to the inmates of the home, nor has it power to prohibit or regulate the furnishing of any article of food which is approved by the officers of the home, by the board of managers and by Congress. Under such circumstances the police power of the State has no application.

We mean by this statement to say that Federal officers who are discharging their duties in a State and who are engaged as this appellee was engaged in superintending the internal government and management of a Federal institution, under the lawful direction of its board of managers and with the approval of Congress, are not subject to the jurisdiction of the State in regard to those very matters of administration which are thus approved by Federal authority.

In asserting that this officer under such circumstances is exempt from the state law, the United States are not thereby claiming jurisdiction over this particular piece of land, in opposition to the language of the act of Congress ceding back the jurisdiction the United States received from the State. The government is but claiming that its own officers, when discharging duties under Federal authority pursuant to and by virtue of valid Federal laws, are not subject to arrest or other liability under the laws of the State in which their duties are performed.

The claim is made that neither the board of managers nor the governor of the home can through their officers or by himself violate the statute law of a State having jurisdiction, when the acts constituting the infringement are not necessary for the government and management of the home for the purpose for which it was incorporated, or authorized by any act of the United States.

This claim might be conceded and still the conviction of the appellee would be invalid, because we find in this record the authority of the United States for the act of the governor. The statutes above referred to, when taken in connection with the admitted facts, show an appropriation by Congress for the

purchase of oleomargarine as part of the regular rations of the inmates of the home. The act of the governor in serving it was authorized by Congress and it was therefore legal, any act of the State to the contrary notwithstanding.

Under the facts herein the state court had no jurisdiction to try the appellee for the offence charged in the written complaint made to the magistrate. See authorities cited in *In re Waite*, 81 Fed. Rep. 359.

Assuming, in accordance with the decision of the state court, that the act of the Ohio legislature applies in terms to the soldiers' home at Dayton, in that State, we are of opinion that the governor was not subject to that law and the court had no jurisdiction to hear or determine the criminal prosecution in question, because the act complained of was performed as part of the duty of the governor as a Federal officer in and by virtue of valid Federal authority, and in the performance of that duty he was not subject to the direction or control of the legislature of Ohio.

The authorities cited in the case of *In re Waite*, *supra*, and those cited by the learned circuit judge in this case fully support the view we have taken herein. The cases of *Tennessee v. Davis*, 100 U. S. 257; *Ex parte Siebold*, 100 U. S. 371, 394, 395; *In re Loney*, 134 U. S. 372; *In re Neagle*, 135 U. S. 1, all concur in upholding the paramount authority of the Federal government under circumstances similar, in effect, to those set forth in this record.

Some of the same authorities also show that this is one of the cases where it is proper to issue a writ of *habeas corpus* from the Federal court instead of awaiting the slow process of a writ of error from this court to the highest court of the State where a decision could be had. One of the grounds for making such a case as this an exception to the general rule laid down in *Ex parte Royall*, 117 U. S. 241; *Whitten v. Tomlinson*, 160 U. S. 231, and *Baker v. Grice*, 169 U. S. 284, consists in the fact that the Federal officer proceeded against in the courts of the State may, upon conviction, be imprisoned as a means of enforcing the sentence of a fine, and thus the operations of the Federal government might in the meantime be

obstructed.  This is such a case. · In *Ex parte Royall*, it was stated by Mr. Justice Harlan, in naming some of the exceptions to the general rule there laid down, that "When the petitioner is in custody by state authority for an act done· or omitted to be done in pursuance of a law of the United States or of an order, process or decree of a court or judge thereof; or where, being a subject or citizen of a foreign State, and domiciled therein, he is in custody, under like authority, for an act done or omitted under any alleged right, title, authority, privilege, protection or exemption claimed under the commission or order or sanction of any foreign State or under color thereof, the validity and effect whereof depend upon the law of nations ; in such and like cases of urgency, involving the authority and operations of the General Government or the obligations of this country to or its relations with foreign nations, the courts of the United States have frequently interposed by writs of *habeas corpus* and discharged prisoners who were held in custody under state authority."

For the reasons herein given we think the order of the Circuit Court of Appeals, affirming the Circuit Court, was right, and it must be

*Affirmed.*

MR. JUSTICE HARLAN concurred in the judgment; but not in all the reasoning of the opinion.

The CHIEF JUSTICE took no part in the consideration or decision of this case.