## Ex parte DICKSON.

(District Court, N. D. New York. January 4, 1926.)

1. **Homicide ⟨⟩125.**

Customs officer, who accidentally killed driver of smuggling automobile, in shooting to cripple car, *held* not chargeable with murder.

2. **Homicide ⟨⟩104—New methods of smuggling require and justify use of force.**

The habitual running of high-powered automobiles across the Canadian line, loaded with smuggled goods, by drivers who not only refuse to stop on signal but attempt to run down or shoot the signaling officers, justifies the use of force by customs officers enforcing the customs laws.

3. **Homicide ⟨⟩104—When officer is justified in using firearms to stop smuggling automobile stated.**

Before an officer is justified in using firearms to stop a smuggling automobile, he should plainly see, or have good reason to believe, that the automobile contains smuggled goods, brought by it over the border, and that the

14 F.(2d)—39

driver knows the officer's official character, and sees his signal to stop, and defiantly refuses to stop.

4. **Habeas corpus ⟨⟩45(2)—Power of federal court to discharge federal officer, charged by state authorities with first degree murder, should be exercised only in extreme cases.**

The power of federal courts, in habeas corpus proceedings, to determine that a federal officer, charged by local authorities with murder in the first degree, is not guilty of any crime, and to discharge him without trial in any court, state or federal, is one which the court should refuse to exercise except in extreme cases.

5. **Removal of causes ⟨⟩22—Customs officer, charged with crime in state court, entitled to removal; "acting by authority of a revenue law" (Judicial Code, § 33 [Comp. St. § 1015]).**

An officer in the customs service is "acting by authority of a revenue law" within the meaning of Judicial Code, § 33 (Comp. St. § 1015), and entitled to removal of a criminal prosecution against him in a state court for an act done in performance of his duties as such officer.

Habeas Corpus. On petition of Samuel Dickson for writ of habeas corpus. Writ granted, but issuance withheld to await action by state authorities.

Oliver D. Burden, U. S. Atty., and Leo W. Breed, Asst. U. S. Atty., both of Syracuse, N. Y., for petitioner.

B. Loyal O'Connell, Dist. Atty., of Plattsburg, N. Y., opposed.

COOPER, District Judge. This is a proceeding instituted under section 753 of the Revised Statutes of the United States (Comp. St. § 1281). The petitioner was brought before the court on a writ of habeas corpus directed to the sheriff of Clinton county, by whom he was confined. The petition sets forth that the petitioner is an immigration inspector stationed along the Canadian border, and was such on August 12th, at the time he was arrested, and on the 11th of August, at the time of the happenings and the events out of which his arrest arose, and that on August 11th, and for some time theretofore, the petitioner had been designated to aid the customs officers in the enforcement of the customs laws and the protection of the revenues of the United States against smuggling in certain territories along the boundary line between New York and Canada, and that he had committed and done no act for which he could be arrested, and that his services were needed for the federal service.

The return filed by the sheriff shows that he was confined by virtue of a commitment

issued by a police justice of the city of Plattsburg, charging the petitioner with the commission of the crime of murder in the first degree under the statutes of the state of New York.

Section 753 provides for the issuance of a writ of habeas corpus and the bringing of a federal officer before the court when he is restrained of his liberty under any process of a state court, if the performance of his duty as a federal officer is thereby interfered with.

The petitioner was released on bail, and this matter was adjourned from August 18, 1925, and from time to time thereafter until after the October term of the Supreme Court of the state of New York, held in Clinton county, by means of an order made and served on the district attorney of that county, reading as follows:

"Ordered that the above-entitled matter be, and the same is hereby, adjourned to the 7th day of November, 1925, at 10:00 a. m. in order to give the Clinton county grand jury an opportunity to act in the case of Samuel Dickson, if that body desires to do so."

Inquiry was thereafter made by the United States attorney whether or not an indictment had been found and the district attorney of Clinton county took the position that he could not properly give any information relating to that subject. Thereupon the day was fixed for November 23d, and the district attorney of Clinton county so notified and requested to state whether such date was convenient for him. He thereupon replied that he did not think that he should take any part in such hearing, which thereupon proceeded on the 23d, 24th, and 25th of November, 1925, and December 30, 1925. Upon such hearing, these facts appeared:

[1] The petitioner, a member of the Immigration Service, had been designated by his superior officer to co-operate with the customs officers, and had been so doing for a period of about five days prior to and including August 11, 1925, being under the immediate charge of one Denner, who had under him, besides the petitioner, two other customs officers, and that the duties of these officers had been such that they had had little or no chance for sleep for five days prior to the day in question. That on the 11th of August the collector of customs at Champlain, N. Y., received a telephone communication that three automobiles had crossed the Canadian line on what is known as the Dodds road and were going south. These automobiles were loaded.

There is no customs house on the Dodds road, or on any southerly road leading therefrom, and it is a road or route often taken by smugglers. The Dodds road extends into the United States about half or three quarters of a mile from the Canadian line. To proceed southerly and avoid any customs house, a smuggler would take either one of two roads, the Hayford road or the Mason road, which two roads intersect at Cooperville or Abood's Corners, where all the happenings occurred out of which this matter arose.

When the collector at Champlain, upon receiving such information, telephoned to Denner, the head of a group of the border patrol, whose territory covered these three roads mentioned and the village of Cooperville and surrounding territory, Denner took his two customs officers and the petitioner with him, proceeded to Cooperville, and made inquiry as to whether or not three cars had passed through that place. Receiving information that they had not, he went toward the Canadian line on the Mason road, deciding that the three cars would probably come on that road. He had proceeded but a short distance on that road when the three automobiles were observed coming toward Cooperville on the Hayford road. Denner and his three men, who were in a Packard touring car, turned around and went back to Cooperville and arrived there in advance of the three automobiles. That was around 12 o'clock midday on a bright sunshiny day in August. The federal officers placed their car in a position across a portion of the road for the purpose of stopping the first automobile. When that automobile came in sight it was loaded with burlap bags, such as were used to contain bottles of Canadian ale. The foremost automobile paid no attention to the signal to stop, ran around on the outside of the road, passed the automobile of the customs officers placed across the junction of the two roads, and went on down the road across the Chazy river in a southerly direction beyond Cooperville. The next car came shortly following the first. This car also refused to stop and passed the automobile of the customs officers across the junction of the two roads, but, instead of continuing in a southerly direction across the square and over the Chazy river, this car turned on the Mason road and went back toward the Canadian line. Denner and two of his officers thereupon jumped into their Packard car, started to pursue the first automobile, which had proceeded southerly through Cooperville, and left the petition-

er, Dickson, at the intersection of the roads, or near there, directing him to stop the third car and seize it and arrest the driver.

The third car speedily came to the intersection of the roads at the center of the hamlet of Cooperville. It was an open Packard car with the top down and loaded with burlap bags, which extended 6 to 10 or 12 inches above the sides of the car, and were plainly visible. The car bore a license number showing that it had been issued in New York City. The car was driven by one Otto Eske, who had been convicted in the federal court of the Northern District of New York for violation of the internal revenue laws and prohibition laws within six months of the day in question, and who had a reputation in that portion of Clinton county as a New York gunman and smuggler.

This car approached the Cooperville junction at a very high rate of speed of not less than 45 miles per hour, as testified to by some of the witnesses. The petitioner, Dickson, was in the regulation uniform of the federal officers stationed on the border, including a cap with a badge thereon, which uniform was well known to all residents of, and persons whose business took them to, that vicinity, including smugglers.

Dickson advanced slightly towards the center of the road as this third automobile driven by Eske approached, raised both hands in a signal to stop, according to some of the witnesses, while others said that the signal consisted of his stretching his arm across the road with a revolver in his hand. Eske driving the loaded automobile came on at the same or an increased speed, and, according to some witnesses, zigzagged his car across the road for the purpose of preventing the crippling of his car by a bullet, and bore directly down upon Dickson at his station on the road. He also swayed from side to side in the automobile seat. Dickson jumped aside to avoid being run over and at or before the time he jumped fired a shot at the radiator, machinery, or tires of the car for the purpose of crippling it. Without any slackening of speed, Eske proceeded on across the Chazy river bridge, which is a narrow bridge, on one or both sides of which was a road leading down to the surface of the river, went about 500 feet to a road leading to the left, and made a sharp turn to the left on this road, went across another small, narrow bridge, up over a railroad track and disappeared from view. A little later the automobile was found adjoining a cabin or house about a mile from the scene of the happenings, partially unloaded, but still containing a large number of bags of Canadian ale. Eske was not in the car. A man named Snyder, the occupant of the cabin, whose present whereabouts is apparently unknown, was not far from several of the bags which had been unloaded from the automobile and placed near a scow on the Chazy river which ran near the cabin. The river at this point is about half a mile from Lake Champlain and navigable all the way. Eske was found shortly thereafter dead on this empty scow, covered by a blanket. A bullet had entered the cheek on one side and had come out of the neck on the other side.

Dr. Allen was procured and went to the place where Eske was lying on the scow. The doctor testified that upon an examination he found that Eske was dead, and that a bullet had apparently ricocheted from something and passed diagonally through the head of the deceased. The car disclosed a bullet mark on the right side near the front on the hood of the car, another on the rising metal running from the hood to the windshield, and a diagonal hole at the bottom of the shield on the left-hand side in front of the driver, and about 10 inches from the outside, and in a direction diagonally upward and on a line with the marks on the hood and on the rising metal, apparently made by a bullet.

It appears that the Hayford road was rough and uneven as the car approached the junction of the roads at Cooperville.

From the foregoing facts it clearly appears that Eske was engaged in smuggling at the time and place in question, and the fact that he had a load of smuggled goods in his automobile was plainly evident to any ordinary observer; that he was signaled to stop by a customs officer in the full uniform of the service, standing near the center of the road at about noon on a bright sunshiny day in August, but refused to stop, and instead attempted to kill or injure the customs officer; that there was no other automobile or other means of stopping or pursuing the automobile or seizing the smuggled goods or arresting the smuggler at Cooperville after the departure of Denner in the Packard car; that the only method which Dickson had of stopping the car, seizing or inspecting the contents, or arresting the driver, was to cripple it, and that the only means of accomplishing this which were available at the time was to fire into the radiator or tires or gasoline tank of the car so that it could not proceed far; that it was well known to the customs officers that smugglers of this kind paid no attention to signals to stop, and that,

unless they themselves struck an obstacle or ran out of the road at a high rate of speed and wrecked their cars, they could be captured in only one of two ways; one was to overtake them in a speedier car and stop them at risk of death or injury to the officers, and the other was to cripple their cars so that they could not proceed.

[2] These swiftly moving, smuggling automobiles may and do bring over the border, not only Canadian ale, but also narcotic drugs, diamonds, silks, and various other kinds of dutiable goods not too bulky, as well as prohibited aliens.

Unless such high-powered automobiles, driven by smugglers and laden with smuggled goods can be stopped and searched at or within a short distance of the Canadian line, the enforcement of the customs laws of the United States will break down, and the revenue derived therefrom will be greatly reduced.

Smugglers of the type of Eske apparently infest the northern border and do not hesitate to kill the customs officers, either by running over them with an automobile or shooting them, if necessary to escape, and they can only be dealt with by methods adequate to enable the smuggling vehicles to be stopped, the contents seized, and the drivers arrested. Neither officers in uniform, nor signals, nor law, nor ethics, nor anything other than force, can accomplish this purpose. Constitution and laws are but scraps of paper to men of this type.

Force was justified under the circumstances of this case. With no other means available to stop the machine, seize the smuggled goods, and apprehend the smuggler (who was a fleeing felon), the petitioner was justified in shooting to cripple the automobile. New machines, usable for rapid transportation, quick escape, and the death or injury of customs officers seeking to apprehend the operators, require and justify the use by the officers of new methods and instrumentalities adequate to cope with the situation thus created.

[3] Great care and caution, however, should be exercised by the customs officers in the use of firearms to cripple an escaping automobile, because a careless aim, a rough road, or other unforeseen circumstance may deflect the course of the bullet from the tire, radiator, or gasoline tank to the driver's seat.

Before the use of firearms is justified, these things should obtain: The customs officer should plainly see or have excellent reason to believe that the automobile contains smuggled goods brought by it over the border. He should be sure that the operator of the automobile knows the official character of the officer and sees his signal to stop and submit to the search required by law. It should be clear that the operator willfully and defiantly refuses to stop and seeks to escape, regardless of the officer in uniform or his signal to stop. There must be no other means available of stopping the automobile, arresting the operator, and seizing the smuggled goods.

The evidence in this case makes it reasonably clear that the petitioner fired for the purpose of crippling the escaping automobile and that alone, and that, if it was a bullet from Dickson's revolver that caused Eske's death, the deflection of the course of the bullet was due to the roughness of the road, the zigzagging course of the automobile, the swaying of the driver, the deflection of the officer's aim when compelled to jump quickly in order to avoid being run over and killed, or to an unexplainable circumstance. There seems to have been no intent on the part of the officer to commit murder or any other crime, and the force and means he used would seem to have been justified, under the circumstances of the case as disclosed by the evidence taken in this proceeding.

[4] There is excellent authority for the discharge of the petitioner in the case of In re Neagle, 135 U. S. 1.[1] In this case the United States marshal had been assigned to protect the life of a federal judge, whose ruling had been given against a person of desperate character, who had made threats against the life of the judge. The judge and the marshal went to a restaurant while en route by train to a distant point, and there the defeated litigant appeared and did things which persuaded the marshal that he was about to do violence to the person of the judge. The marshal shot and killed him to prevent such violence being done. The United States Supreme Court held that the marshal had committed no crime, that he was acting wholly within the scope of his duties, and that he could not be tried in any state court for shooting the deceased litigant.

In Ohio v. Thomas, 173 U. S. 276, 19 S. Ct. 453, 43 L. Ed. 699, the Governor of a Soldiers' Home in Ohio was arrested for violation of the Ohio state law prohibiting the use of oleomargerine, convicted, fined, and confined in jail for nonpayment of his fine. The United States Supreme Court held that he was acting strictly pursuant to federal authority, and that the acts which he did were within the scope of his duties, that he was not guilty of any crime against the state law,

[1] 10 S. Ct. 658, 34 L. Ed. 55.

and that the state law did not apply to him in his official capacity. He was summarily released. A similar case is Johnson v. Maryland, 254 U. S. 51, 41 S. Ct. 16, 65 L. Ed. 126.

But the power of the federal courts to interfere with state or county officers and state courts where federal officers of certain kinds are arrested, detained in jail, and the performance of their duties prevented, while undoubtedly existent, should be exercised with great care and discretion. And where the federal court is called upon in habeas corpus proceedings to find that a federal officer, charged by state authorities with the most serious of crimes, murder in the first degree, is not guilty of such crime, and to discharge him without trial in any court, federal or state, the federal court should refuse to exercise such power, except in extreme cases. Baker v. Grice, 169 U. S. 284–290, 18 S. Ct. 323, 42 L. Ed. 748; Ex Parte Royall, 117 U. S. 241, 6 S. Ct. 734, 29 L. Ed. 868; Drury v. Lewis, 200 U. S. 1, 26 S. Ct. 229, 50 L. Ed. 343; Whitten v. Tomlinson, 160 U. S. 231, 16 S. Ct. 297, 40 L. Ed. 406; Castle v. Lewis, 254 F. 917, 166 C. C. A. 279.

[5] It is not necessary, however, that such a federal officer, if a revenue officer, be either discharged or delivered to the local authorities for trial. Provision is made in the federal law for the removal to the federal court of the trial of all suits, both civil and criminal in their nature, which are brought in local courts against any officers engaged in the revenue service of the federal government. This is section 33 of the federal Judicial Code (Comp. St. § 1015). No such power of removal existed at the time as to United States marshals or governors of Soldiers' Homes, the federal officers mentioned in the above-mentioned cases of Re Neagle and Ohio v. Thomas, supra, for the reason that they were not engaged in the revenue service of the United States. A customs officer, such as the petitioner here, is unquestionably engaged in the revenue service of the United States, and, as such, the trial of any indictment found against him for anything done while engaged in the performance of his duties may be removed to the federal court for trial under the above-mentioned section.

While confinement in jail without bail, as was the case of the petitioner here, is and would be a case of improperly interfering with the operations of the government of the United States, and would warrant the federal court in a summary examination of the facts under a writ of habeas corpus and action on the facts disclosed, yet even murder in the first degree is bailable under certain circumstances, and the federal court has the same power, after removal, to admit to bail that a Justice of the Supreme Court of the state would have. But the power of removal does not arise until after indictment. The federal service, therefore, in such a case as this, will not be seriously interfered with once an indictment is found and the case is in condition for removal, as this court can and will admit the petitioner to bail.

Withholding the discharge of the petitioner on this writ until a reasonable opportunity for an indictment in the state court may be had seems to the court, under the circumstances of this case, to be the proper exercise of the discretion vested in the court.

The decision therefore is that, upon the facts of this case now before the court, the petitioner committed no crime, that the petitioner's writ will be sustained, and the petitioner will be discharged, but that the entering of the order and the discharge of the petitioner will be postponed until 30 days after the final adjournment of the next term of the Supreme Court in the county of Clinton in the state of New York. If at that time, or any time between this date and that time, an indictment shall have been or shall be found against this petitioner, charging him with any offense arising out of the acts and things done by him on the 11th of August, 1925, and sufficient information shall be brought to this court before such day, 30 days after the adjournment of the next term of the Supreme Court in the county of Clinton, in that event the writ will be dismissed, and the prisoner will be remanded to the custody of the sheriff of the county of Clinton in order that the trial of the petitioner on such indictment may be had in this court after removal.

The matter is held until the time indicated, the petitioner's bail continuing in the meantime.