UNA A. STEPHENS, Appellant, v. THE FIRST NATIONAL BANK OF NEVADA, a Corporation, and AUGUST A. GLANZMANN, as Administrator of the Estate of PAUL F. GLANZMANN, Deceased, Respondents.

No. 3479

August 10, 1948.                    196 P.2d 756.

354

See, also, 64 Nev. 292, 182 P.2d 146.

*W. T. Mathews,* of Carson City, for Appellant.

*George L. Sanford* and *Richard Hanna,* both of Carson City, for Respondents.

*Miles N. Pike,* United States Attorney for the District of Nevada, and *Bruce R. Thompson,* Assistant United States Attorney, both of Reno, Amici Curiae.

# OPINION

By the Court, HENDERSON, District Judge:

This is an appeal from a judgment in favor of the defendant, August A. Glanzmann, as administrator of the estate of Paul F. Glanzmann, deceased, in an action brought by the appellant, the plaintiff in the court below, claiming to be the owner of and entitled to the possession of certain United States Registered Savings Bonds of different denominations and being in the aggregate sum of $5,900. The appeal is also from an order of the court below, denying plaintiff's application for a new trial. There is little dispute as to the facts in the case. From the pleadings and the evidence, it appears that beginning with the year 1936 and at different times thereafter, up to and including the month of December 1941, Paul F. Glanzmann and Una E. Stephens were residents of Carson City, Ormsby County, State of Nevada, and during said time the said Paul F. Glanzmann purchased and had issued a series of United States Registered Savings Bonds. These bonds were purchased with money belonging to said Paul F. Glanzmann and were issued and registered under the federal act known as the Second Liberty Loan Act, 31 U.S.C.A. Section 757c and the United States Treasury Regulations promulgated pursuant to the authority therefor contained in the act. At the time the said Glanzmann purchased the said bonds, and on each of them, there were inscribed thereon the names of Mr. Paul F. Glanzmann or Mrs. Una E. Stephens. The records show these bonds were registered in the Treasury Department of the United States as aforesaid, and that Paul F. Glanzmann and Mrs. Una E. Stephens were co-owners. The evidence further shows that some time in October 1935, the said Paul F. Glanzmann and Una E. Stephens rented from the First National Bank at Carson City, Nevada, a safety-deposit box known as 25 C and that each of the

parties signed the signature card therefor. When the bonds were purchased by the said Paul F. Glanzmann, the said bonds were placed in said safety-deposit box in said bank. The rental agreement evidenced by the signature card shows that said box was held in joint-tenancy with the right of survivorship. That the said rental agreement was in effect at the time of the death of Paul F. Glanzmann.

■ The bonds when purchased were placed in said safety-deposit box by Mr. Paul F. Glanzmann and there is no evidence to indicate he ever removed them from the box. The rental agreement, insofar as the safety-deposit box is concerned, shows that both of the parties, independent of the other, had the right of access to the said safety-deposit box and the contents thereof, with the right to remove all or any part of said contents and to surrender said box without the consent or knowledge of the other or any other person. But while this was permitted and both parties had the right of access to said box and the contents thereof, it did not and does not determine a right of ownership of the contents of said box. Subsequent to the purchase of said box as aforesaid and the rental of the safety-deposit box as aforesaid and on April 12th, 1944, the said Paul F. Glanzmann died in a hospital in Reno, Nevada. Apparently he died intestate. A brother, August A. Glanzmann, one of the defendants and respondent herein, was appointed administrator of his estate on April 12th, 1944. After Paul F. Glanzmann died, the plaintiff herein, August A. Glanzmann, administrator of the estate of Paul F. Glanzmann, attorney George L. Sanford and W. L. Cassinella, manager of the Carson City branch of the First National Bank of Nevada, entered the safety-deposit box 25 C, examined the contents of said box and an inventory of the contents was made and a copy of said inventory was given to August A. Glanzmann, Una E. Stephens, and Mr. Cassinella. At that time they found in said box, papers, bonds and money

belonging to each of the parties individually and also the bonds in question. Again in July of 1944, the box was opened in the presence of the plaintiff herein, Mrs. Stephens, Attorneys Sanford and Mathews and certain disposition was made of the contents of the box and delivery was made to the respective parties of certain bonds, papers and money as agreed upon and shown by the stipulation agreed upon. The bonds in question were left in the box. From the inventory of the contents of the box and distribution of the contents thereof, the evidence shows that besides the bonds in question there were other papers, documents and property in the said box, some belonging to Mrs. Stephens and some belonging to Paul F. Glanzmann. Especial note should be taken of the fact that the contents of the safety-deposit box consisted of property of Mrs. Una E. Stephens and Mr. Paul F. Glanzmann and the bonds in question.

At the time the safety-deposit box was rented from the said bank, two keys were given to the respective parties renting the said box and the evidence shows that at all times, Mrs. Una E. Stephens had in her possession one of the said keys and that the box was opened at the times mentioned herein, by using the key in her possession.

It appears from the evidence that on April 7, 1944, Paul F. Glanzmann appeared at the bank and orally advised Mr. Cassinella, manager of the bank, that he didn't want anyone to enter his safety-deposit box and further it appears that on April 8, 1944, Mr. Cassinella received a telegram purporting to be from said Paul F. Glanzmann reading:

"Do not let anyone in safety-deposit box."

There is no evidence to show the said Paul F. Glanzmann at any time attempted to remove any of the contents from said box and particularly no attempt was made by him to remove the bonds in question from the box or to cash them or to change the registration thereof.

The question before the court is, who is the owner

and who is entitled to possession of these certain eleven (11) U. S. Savings Bonds purchased by the said Paul F. Glanzmann and registered in the names of Mr. Paul F. Glanzmann and Mrs. Una E. Stephens, as co-owners. The defendant, the First National Bank of Nevada, disclaimed all interest in the subject matter and the action was dismissed as to said defendant in this case.

■■  At the outset what was the effect of Mr. Paul Glanzmann orally advising Mr. Cassinella not to let anyone enter his safety-deposit box? What was the effect of the telegram purporting to be from said Paul F. Glanzmann to said Mr. Cassinella? Can it be said by said acts of Mr. Paul F. Glanzmann that the plaintiff Mrs. Una E. Stephens, would be precluded from entering the said safety-deposit box and removing the contents therefrom? Especially can it be said by said act of Paul F. Glanzmann that said Cassinella had the right to preclude plaintiff Mrs. Una E. Stephens from entering the said safety-deposit box and removing therefrom the property therein which belonged to her and to her alone? We think not. Notwithstanding what Mr. Cassinella did in response to the order of Mr. Glanzmann, both oral and written, we do not think that either of the parties who rented the safety-deposit box could be precluded from entering the same and removing the contents therefrom. It must be conceded that in the usual course of business, many safety-deposit boxes are rented by at least two individuals, each having a key thereto and each having a right to enter said safety-deposit box. In the usual course of business, can it be said that when safety-deposit boxes are rented by two or more persons, with the right as aforesaid, that any one of the parties renting and having access to said box could by word of mouth or telegram, or any writing addressed to the manager or some other officer in authority of the bank renting said safety-deposit box, preclude the other from entering the box? If this were the case, few safety-deposit boxes would be rented giving another person

joint ownership therein, with the right of access to the box and with a key thereto, not even to husband and wife.

In our opinion until the rental agreement expired, either by limitation or by joint action of both parties renting said safety-deposit box 25C, either party had a right to enter said safety-deposit box and remove the contents therefrom, not only during the lifetime of the parties but (subject to certain exceptions not applicable here) even after the death of one of the said parties.

We do not by this assertion mean to imply that this right given to each of the parties, that is, the right of access to the box and the removal of any of the contents thereof, would determine the ownership of the contents of said box.

As before stated, the bonds in question were purchased under the federal act known as the Second Liberty Loan Act, 31 U.S.C.A. section 757c, and the United States Treasury Regulations promulgated pursuant to the authority thereof contained in the act. To arrive at a proper conclusion in this case, it therefore becomes necessary to review and analyze the federal regulations promulgated thereunder. It cannot be denied that the source of the federal power to issue United States Savings Bonds and to promulgate regulations governing their ownership, transfer and payment is found in article one (1), section eight (8), clause two (2) of the Constitution of the United States, providing: "The Congress shall have Power * * * To borrow Money on the credit of the United States."

And it is further provided in such article of the Constitution, section eight (8), clause eighteen (18) that Congress shall have power * * * "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

■ ▪ The federal borrowing power, pursuant to the

constitutional provision, includes the power to issue in return for the money borrowed, obligations of the United States in any appropriate form, stocks, bonds, bills or notes. Legal Tender Cases, 110 U.S. 421, 444, 4 S.Ct. 122, 28 L.Ed. 204. Now, in the exercising of the constitutional power to borrow money on the credit of the United States, Congress enacted section twenty-two (22) of the Second Liberty Loan or Bond Act, which act entitled the Secretary of the Treasury, with the approval of the President, to issue from time to time, through the Postal Service, or otherwise, bonds of the United States to be known as "United States Savings Bonds," and further authorized the Secretary of the Treasury to issue such Savings Bonds in such form and in such manner and subject to such terms and conditions consistent with the act as the Secretary of the Treasury from time to time may prescribe. Act of Sept. 24, 1917, ch. 56, sec 22, as amended by act of Feb. 4, 1935, ch. 5, sec. 6, 49 Stat. 21, 31 U.S.C.A. sec. 757c.

Pursuant to said authority, the Secretary of the Treasury promulgated regulations governing the issuance, transfer, ownership and payment of United States Savings Bonds. These regulations, such as pertain to the case at bar, are before this court as plaintiff's Exhibits "E" and "F." Exhibit "E" is a compilation of certain United States Treasury Circulars which were issued from time to time and contain the offering of the respective series of the United States Savings Bonds covering the time involved in this case.

Exhibit "F" contains the respective Treasury Regulations issued by the Secretary of the Treasury with respect to the registration, restrictions and payment of the bonds of all series during the time involved in this case.

Of the aforesaid regulations there are three of the same pertinent to the issues of this case.

"1. Forms of Registration.—Subject to the restrictions and exceptions set forth in the next preceding

paragraph the following forms of registration are authorized * * *

"(ii) In the names of two (but not more than two) persons in the alternative as co-owners, for example, 'John A. Jones OR Mrs. Ella S. Jones'. No other form of registration establishing coownership is authorized.

"2. Payment or Reissue.—A savings bond registered in the names of two persons as coowners, for example, 'John A. Jones or Mrs. Mary C. Jones', will be paid or reissued as follows:

"(1) During the lives of both coowners.—During the lives of both coowners the bond will be paid to either coowner upon his separate request without requiring the signature of the other coowner; and upon payment to either coowner the other person shall cease to have any interest in the bond.

"(2) After the death of one coowner.—If either coowner dies without having presented and surrendered the bond for payment to a Federal Reserve Bank or the Treasury Department, the surviving coowner will be recognized by the Treasury Department as the sole and absolute owner of the bond, and payment will be made only to him.

"3. Determination of interest as Between Owner and Co-Owner of Beneficiary.—Conflicting claims as to ownership of or interest in a savings bond, as between the registered owner and the co-owner, or the registered owner and a designated beneficiary may be determined by valid judicial proceedings, in which case, the bond upon surrender by the party requesting reissue, may be reissued in the names of the respective parties to the extent of their respective interests as determined by such proceedings, but only in authorized denominations. The Treasury can accept no notices of pending judicial proceedings and cannot undertake to protect the interests of the litigants who do not have possession of the bonds. (Regulation 315.52, Treasury Circular 530)."

■ These Treasury Regulations become a part of the

contract, whereby the United States will pay its obligation to a person or persons named in the bond to receive payment as provided by the terms of such Treasury Regulations. The power given to the Secretary of the Treasury to make such regulations, was and is properly delegated to the said Treasury Department of the United States by Congress. Hampton v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; Buttfield v. Stranahan, 192 U. S. 470, 472, 24 S.Ct. 349, 48 L.Ed. 525; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563.

■ Such regulations are valid and have the force and effect of the Federal Law. McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579; U. S. v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 5 L.Ed. 930; U. S. v. Sacks, 257 U.S. 37, 42 S.Ct. 38, 66 L.Ed. 118; and others.

■■ The bonds in question are United States Bonds, authorized and issued pursuant to the federal law and federal regulations. The sale thereof, and purchase thereof, constitute a contract between the Federal Government and the purchaser thereof. It is our opinion that the deceased, Glanzmann, in purchasing the said bonds having inscribed thereon the name of Una E. Stephens as co-owner, entered into a contract with the United States, whereby the payment or reissue of said bonds as purchased by said Paul F. Glanzmann were issued in conformity and were to be paid or reissued in conformity with the laws and regulations governing the sale of said bonds. It is uncontroverted that the bonds were placed in the safety-deposit box 25C, and thereafter no attempt was made by either of the parties, that is, the deceased Paul F. Glanzmann or Una E. Stephens, to remove the bonds from said safety-deposit box. It is not and cannot be claimed, that the deceased Paul F. Glanzmann made any attempt to deprive Mrs. Una E. Stephens of any right to said bonds, by his oral statement or the written telegram to Mr. Cassinella, manager of the said bank, where the said safety-deposit box was.

In our interpretation of the rules and regulations, it is our opinion that Mrs. Stephens, at the time of the purchase of the bonds, in the manner in which they were purchased, to wit, inscribed to the deceased Paul F. Glanzmann and Mrs. Una E. Stephens, as co-owners; thereupon became a co-owner in the said bonds and had a property interest therein. And she could be divested thereof only in the manner set forth by said government regulations, that is by removing the bonds from said safety-deposit box and cashing the same or having the same reissued.

■ It is our opinion if Glanzmann had intended to deprive Mrs. Stephens of the property right, which we think she had in said bonds, at the time he orally told Mr. Cassinella not to let anyone enter the safety-deposit box, that he would have removed the bonds therefrom and cashed the same. It seems that no such intention was ever manifested by Mr. Paul F. Glanzmann.

Under the facts hereinabove recited and for the reasons heretofore and hereinafter appearing it is our opinion that Regulations, sec. 315.52, dealing with conflicting claims as to ownership of or interest in a savings bond, as between the registered owner and the co-owner, or the registered owner and a designated beneficiary, do not control the instant case, nor do we find it necessary to cite examples of controversies which, by reason of their nature, would be governed by this provision.

■ It does not appear to the court that any controversy over "conflicting claims as to the ownership" between the co-owners, or otherwise, ever existed in this case. The bonds in question were issued pursuant to the provisions of the act and governed by the treasury regulations hereinabove referred to. Under the said regulations, it is provided if either co-owner dies without having presented and surrendered the bond for payment, the surviving co-owner will be recognized as the sole and absolute owner of the bond and payment will be made only to him. These regulations are reasonable and were adopted for carrying out the intent of the act

of Congress for the purpose of borrowing money. The regulations are supplementary and existed at the time the purchase of the savings bonds in question was made from the treasury department. This promotes and facilitates the sale and distribution of the bonds by prescribing such terms and conditions of payment, ownership, and transfer as would make the bonds attractive securities. It is common knowledge that many bonds issued by the United States, were purchased making the purchaser a co-owner with some other designated person named by the purchaser of said bonds. In many instances the co-owner did not know of the existence of the fact that he was a co-owner of a United States Savings Bond or bonds. Everyone is aware of the fact that many United States bonds were and are now being bought, by husbands and fathers, making their wives, sons and daughters co-owners, where even the wife, son and daughter did not and does not know of the existence of such bonds until after the death of the husband or father. It was the intent and purpose of many purchasers of bonds of this character to purchase bonds and make some other party a co-owner so that the co-owner would own said bonds after the death of the original purchaser. This is one of the reasons why said bonds became and were and are attractive investments and aided in the sale thereof. For the court to say now, in this case, that Mrs. Stephens has no right or interest in said bonds, would be to set aside the intent and purpose of many persons who purchased bonds, as these bonds were purchased pursuant to the regulations of the treasury department. And to say that after the death of one co-owner, the administrator of the estate of said deceased co-owner, could claim said bonds and ask the court to determine the ownership of the bonds, under section 315.52, as aforesaid, would tend to destroy the power of the United States to sell bonds, particularly in the State of Nevada.

■ To hold otherwise, would destroy the real purpose and intent of the purchaser to purchase bonds of the United States, with the intent that a co-owner would become the owner designated by the purchaser upon his death, and would permit the heirs of the purchaser upon his decease, or the administrator or executor of his estate to nullify the intent originally planned by the purchaser of the bonds. It is our opinion that these regulations having the force of federal law must be held to supersede inconsistent state laws by virtue of the supremacy clause of the constitution.

Article VI, clause 2, of the constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, Any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The supreme court of the United States has asserted and applied that doctrine of the supremacy of the federal law in a variety of situations, many of them analogous to the case here. It has been held in the exercising of the constitutional power to borrow money, the federal government may not against its will be subjected to burdens imposed by the states. Farmers & Mechanics Savings Bank v. Minnesota, 232 U.S. 516, 34 S.Ct. 354, 58 L.Ed. 706.

In the Farmers Bank decision, supra, the supreme court, referring to McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, said: "The supremacy of the Federal Constitution and the laws made in pursuance thereof, and the entire independence of the General Government from any control by the respective States, were the fundamental grounds of the decision. The principle has never since been departed from, and has often been reasserted and applied. 232 U.S. 516, 521, 34 S.Ct. 354, 355, 58 L.Ed. 706."

If the state laws governing the devolution of personal property are permitted to supersede or nullify the federal regulations applicable to savings bonds, then the borrowing power of the United States will be adversely affected, if not destroyed, because of the uncertainty it will create in the minds of millions of owners of savings bonds in the respective states as to their rights and interest therein, and because of the consequent elimination of those features of the bonds which have made them attractive to many persons. Again if the state law governing the devolution of personal property is permitted to supersede or to nullify the federal regulations governing savings bonds, then we will have a situation involving laws relative to devolution of personal property in the forty-eight different states.

Again what would be the situation if the state law was declared to be supreme and the bonds were purchased in one state, and taken by the co-owner to a different state, or what would be the situation if the bonds were bought in one state and the co-owner thereafter resided in a different state?

It seems clear to us that insofar as the regulations of the federal government governing the sale of bonds is concerned, such regulations must be held to supersede state law.

The form in which the state burden is sought to be imposed is immaterial. The transactions of the federal government are as free from state regulations as they are from state taxation. Osborn v. Bank of United States, 9 Wheat. 738, 6 L.Ed. 204; Ohio v. Thomas, 173 U.S. 276, 19 S.Ct. 453, 43 L.Ed. 699; and others.

Within the sphere of the powers confided to it, the United States may enter into contracts appropriate to the exercise of those powers, and such contracts are governed by federal rather than state law. United States v. Tingey, 5 Pet. 115, 8 L.Ed. 66; Irvine v. Marshall, 20 How. 558, 15 L.Ed. 994; United States v. Grogan, D.C., 39 F.Supp. 819; and others.

And when the question concerning federal jurisdiction arises in a state court, it is clear that the state court, in determining the consequences of the transaction, must follow the federal law. Garrett v. Moore-McCormack Co. Inc., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239.

Section 22 of the Second Liberty Bond Act, quoted herein and the treasury regulations promulgated thereunder and having the force and effect of law, form a part of the bond contract, not only by express reference incorporated in each bond to the act itself, but under the well-established doctrine that laws effective at the time of the making of a contract enter into and form a part of it as fully as if they had been expressly referred to or incorporated in its terms. Farmers and Merchants Bank v. Federal Reserve Bank, 262 U.S. 649, 43 S.Ct. 651, 67 L.Ed. 1157, 30 A.L.R. 635; Northern Pacific Ry. v. Wall, 241 U.S. 87, 36 S.Ct. 493, 60 L.Ed. 905.

The foregoing rule of law is most aptly illustrated in the case of Warren v. United States, 68 Ct.Cl. 634, Certiorari Denied 281 U.S. 739, 50 S.Ct. 346, 74 L.Ed. 1154.

The facts in this case are quite fully set out in the appellant's opening brief and will not be restated here. We believe that the holding of the court in said case is pertinent. The headnote reads: "Under the statute authorizing the Secretary of the Treasury to issue war-savings certificates the Secretary had the power to prescribe the terms and conditions of their payment, and the Secretary's due regulations with respect thereto had the force and effect of law. Where the owner of such certificates named the beneficiary thereof, in case of his death, and the regulations provided for payment to such beneficiary in that event, the refusal of the Secretary to make payment to the executrix of the owner's estate was in conformity to the provisions of the contract thus entered into with the owner of the certificates, and the executrix is not entitled to recover from the United States the money

represented by the certificates, notwithstanding the laws of devolution of property in the State of the testate's domicile."

We believe the foregoing is in point with the case at bar.

As stated heretofore in this opinion, Exhibits "E" and "F" are before this court as original exhibits. They constitute the treasury regulations issued by the Secretary of the Treasury concerning United States Savings Bonds. Exhibit "E" is made up of various circulars, beginning, so far as pertinent here, with Circular No. 554 of December 16, 1935, relating to Series B. Bonds, the first bonds of concern herein. Thereafter from time to time circulars following No. 554 were issued, describing the bonds and series thereof offered and in most cases the terms and conditions of purchase. The respective bonds herein were Series B in October 1936, Series D, May, 1940, Series E, July, 1941, April, 1943, Series G, December, 1941. An examination of Exhibit "E" discloses the conditions under which these series of bonds were offered and issued. It will also be noted that said circulars gave notice that such bonds would be issued and registered pursuant to Treasury Regulations No. 530 and revisions thereof. Exhibit "F" is composed of this regulation No. 530 and amendments and revisions thereafter made beginning with Circular No. 530, dated February 25, 1935, to and including circular dated June 12, 1944, being sixth amendment to fifth revision of Circular No. 530.

It will be noted that beginning with February 25, 1935, the treasury department treated as conclusive the ownership and interest in the savings bonds, and so treated the registration in the names of two persons as co-owners. The treasury department also provided that such bonds are not transferable and such bonds would be payable to either co-owner without the signature of the other, and that upon payment to either person the other shall cease to have any interest in the bonds.

It therefore appears from the treasury regulations that all savings bonds issued shall be subject to regulations prescribed from time to time by the Secretary of the Treasury and it further appears that the regulations and circulars issued by the Secretary of the Treasury contain the notice of issuance and offer of sale of bonds as regulations and restrictions on and concerning such bonds and are notice to the purchaser of the conditions surrounding the purchase and registration of such bonds and that the purchaser thereof is bound thereby particularly as the bonds themselves contain reference to such regulations.

It further appears that the bonds must be registered. The form of registration used must express the actual ownership and interest in the bonds, which shall be considered as conclusive of such ownership and interest. Again the Second Liberty Loan Act and the treasury regulations provide for and sanction contracts for the benefit of third persons, which contracts are enforceable by such third persons. It has been held that such contracts for the benefit of the third persons are valid and enforceable. 12 Am.Jur. 825, sec. 277.

The text cites Painter v. Kaiser, 27 Nev. 421, 76 P. 747, 65 L.R.A. 672, 103 Am.St.Rep. 772, 1 Ann.Cas. 765, in support thereof.

In the Painter case this court said, quoting from Miliani v. Tognini, 19 Nev. 133, 134, 7 P. 279: " 'The precise question presented is this: Can a plaintiff maintain an action on a simple contract to which he is not a party, upon which he was not consulted, and to which he did not assent, when it contains a provision for his benefit? Besides the statute which provides that "every action shall be prosecuted in the name of the real party in interest," this court has held in three different cases that the beneficiary named in such a contract may maintain an action thereon in his own name.' " [27 Nev. 431, 76 P. 750.]

Another illuminating case on this point is the Kansas City Life Ins. Co. v. Rainey, 353 Mo. 477, 182 S.W.2d

624, 155 A.L.R. 168, also Rhorbacker v. Citizens Bldg., Association Co., 138 Ohio St. 273, 34 N.E.2d 751, 135 A.L.R.988. In this last case the subject matter was a certificate of deposit in the company payable to the depositor and another named thereon or to the survivor of them as co-owner. The person named as co-owner had no knowledge of the transaction until after the death of the depositor. In disposing of a contest over the ownership of the certificate after the death of the original depositor, the court held that an executed contract arose between the depositor and the company, creating an immediate joint and equal interest in the certificate in the depositor and the named person, with attendant incident of survivorship, binding the company to its terms. Upon the death of the depositor the named person became the owner of the certificate, entitled to its possession and benefits by virtue of a completed contract.

In at least thirteen different states of the United States, many cases have reached the appellate courts to determine the title and ownership of United States Savings Bonds and in a majority of cases, the doctrine was and is definitely adopted that the federal law and treasury regulations, and the contract entered into at the time of the purchase and registration of the savings bonds govern with respect to the title and ownership of such bonds and where a contest arose between an administrator or executor of an estate of a deceased owner, and his or her co-owner or beneficiary, such co-owner or beneficiary was declared the owner of such bonds irrespective of the state laws governing the devolution of property. The overwhelming weight of authority supports the proposition that the purchase and registration of the United States Savings Bonds, where a co-owner is named thereon, creates and constitutes a contract for the benefit of the third party, regardless of whether such co-owner knows or knew of the transaction until after the death of the purchaser, or whether such co-owner

ever had possession of such bonds or whether any delivery thereof was made to him or her. Suffice it to say that unless the purchaser and owner thereof in his lifetime changed the purport of the bonds according to the treasury regulations, that upon his death such bonds became the sole property of the co-owner.

We have before us the lower court's opinion and decision and its findings of fact and conclusions of law. It seems to us that the court relied upon the telegram from Glanzmann to the bank "not to let anyone in his safety-deposit box," and the court so relying concluded that the said telegram did in fact deprive the surviving co-owner of all right, title and interest, in and to said bonds. It appears that the court proceeded further upon the theory that no gift causa mortis or inter vivos was had, and no delivery of the bonds was made to the co-owner. The lower court must have set aside the fact that Mrs. Stephen's name was on the bonds, as a co-owner, and must have ignored entirely the treasury regulations and law under which the bonds were purchased. In short, the lower court must have ignored and cast aside the operations of the federal regulations which were, at the time of the purchase of said bonds, a part of said bonds, and thereby reached a wrong conclusion. There is little or no conflict in the evidence with respect to the purchase of the bonds, that Mrs. Stephens's name was inscribed on each bond in question, that each bond was registered in the treasury department with Mrs. Stephens's name so registered as co-owner all pursuant to the treasury regulations.

There is no evidence that Glanzmann ever attempted to surrender or change the ownership of any of the said bonds during his lifetime or that he ever intimated to any person that the bonds were not to go to Mrs. Stephens after his death.

It is well-settled law in this state, that if there is a substantial conflict in the evidence, findings and

judgment of the trial court will not be disturbed but in this case there is no substantial or any conflict in the evidence as to the purchase and registration of the bonds and the effect thereof with respect to the regulations governing such bonds.

The conflict, if any, is in the application of the applicable law to the purchase, registration and deposit of the bonds. In resolving this conflict, we are of the opinion that the lower court reached a wrong conclusion and by reason thereof the decision and judgment of the lower court is erroneous and against the law.

This court in Consolazio v. Summerfield, 54 Nev. 176, 10 P.2d 629, 630, said: "The general rule of this court is that when the evidence is conflicting and there is substantial evidence to sustain the judgment it will not be disturbed. But there is an exception to the general rule to the effect that where, upon all the evidence, it is clear that a wrong conclusion has been reached, the judgment will be reversed."

Entertaining the view that the facts in this case are such, as show the appellant to be the owner of and entitled to the possession of the bonds in question, it is the order of this court, that the judgment of the lower court be reversed, with directions to render and cause to be entered a judgment in favor of the plaintiff herein, in accordance with the prayer of the complaint.

HORSEY and BADT, JJ., concur.

Chief Justice EDGAR EATHER, because of illness, did not participate in the preparation and rendition of the foregoing opinion. The Governor assigned Hon. A. S. HENDERSON, District Judge of the Eighth Judicial District, to sit in his place.