**STATE OF ALABAMA v. UNITED STATES.**
No. J–607.

Court of Claims.
March 12, 1930.

Thomas E. Knight, of Selma, Ala., and A. A. Evans, of Montgomery, Ala. (C. C. McCall, of Montgomery, Ala., on the brief), for State of Alabama.

G. H. Foster, of Washington, D. C., and Herman J. Galloway, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GRAHAM, WILLIAMS, LITTLETON, and GREEN, Judges.

GRAHAM, Judge.

This case came up on demurrer to the petition. It presents the following admitted facts: Congress, by section 124[1] of the National Defense Act, 39 Stat. 166, 215 (50 USCA § 79), authorized the construction of "dams, * * * power houses, and other plants * * * for the generation of electrical or other power," admittedly in the exercise of its constitutional power. As an incident to the completion of the dam there was created a large amount of water power. The dam is known as the Wilson Dam and is situated in the state of Alabama. Section 124 of the said act authorized the President, in dealing with the "products of such plants," as follows:

"* * * Any surplus which he shall determine is not required shall be sold and disposed of by him under such regulations as he may prescribe.

"The President is hereby authorized and empowered to employ such * * * agencies as may in his discretion be necessary to enable him to carry out the purposes herein specified."

The petition inter alia avers:

"* * * That heretofore the United States constructed Wilson Dam across the Tennessee River at Muscle Shoals in Alabama, and that the said United States has heretofore constructed a power plant in connection with said shoals in Alabama, which said plant is used by the said United States in manufacturing and developing hydroelectric energy. * * * That the said United States has sold to the Alabama Power Company during the calendar year of 1926 approximately 429,311,000 kilowatt-hours of hydroelectric power developed by said plant in said State of Alabama. * * * that since October 1, 1927, and continuously up to and including this date, said United States has exercised the privilege of manufacturing and selling hydroelectric power in the

---

[1] "Sec. 124. Nitrate supply.—The President of the United States is hereby authorized and empowered to make, or cause to be made, such investigation as in his judgment is necessary to determine the best, cheapest, and most available means for the production of nitrates and other products for munitions of war and useful in the manufacture of fertilizers and other useful products by water power or any other power as in his judgment is the best and cheapest to use; and is also hereby authorized and empowered to designate for the exclusive use of the United States, if in his judgment such means is best and cheapest, such site or sites, upon any navigable or nonnavigable river or rivers or upon the public lands, as in his opinion will be necessary for carrying out the purposes of this act; and is further authorized to construct, maintain, and operate, at or on any site or sites so designated, dams, locks, improvements to navigation, power houses, and other plants and equipment or other means than water power as in his judgment is the best and cheapest, necessary or convenient for the generation of electrical or other power and for the production of nitrates or other products needed for munitions of war and useful in the manufacture of fertilizers and other useful products.

"The President is authorized to lease, purchase, or acquire, by condemnation, gift, grant, or devise, such lands and rights of way as may be necessary for the construction and operation of such plants, and to take from any lands of the United States, or to purchase or acquire by condemnation materials, minerals, and processes, patented or otherwise, necessary for the construction and operation of such plants and for the manufacture of such products.

"The products of such plants shall be used by the President for military and naval purposes to the extent that he may deem necessary, and any surplus which he shall determine is not required shall be sold and disposed of by him under such regulations as he may prescribe.

"The President is hereby authorized and empowered to employ such officers, agents, or agencies as may in his discretion be necessary to enable him to carry out the purposes herein specified, and to authorize and require such officers, agents, or agencies to perform any and all of the duties imposed upon him by the provisions hereof.

"The sum of $20,000,000 is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, available until expended, to enable the President of the United States to carry out the purposes herein provided for.

"The plant or plants provided for under this Act shall be constructed and operated solely by the Government and not in conjunction with any other industry or enterprise carried on by private capital.

"In order to raise the money appropriated by this Act and necessary to carry its provisions into effect, the Secretary of the Treasury, upon the request of the President of the United States, may issue and sell, or use for such purpose or construction hereinabove authorized, any of the bonds of the United States now available in the Treasury of the United States under the Act of August fifth, nineteen hundred and nine, the Act of February fourth, nineteen hundred and ten, and the Act of March second, nineteen hundred and eleven, relating to the issue of bonds for the construction of the Panama Canal, to a total amount not to exceed $20,000,000; Provided, That any Panama Canal bonds issued and sold or used under the provisions of this section may be made payable at such time after issue as the Secretary of the Treasury, in his discretion, may deem advisable, and fix, instead of fifty years after date of issue, as in said Act of August fifth, nineteen hundred and nine, not exceeding fifty years."

State of Alabama to the Alabama Power Company, a corporation.

" * * * That the Legislature of the State of Alabama passed a revenue law, approved by the Governor of Alabama July 22, 1927, which provides, among other things, as follows:

" 'Section 2–D:

" 'In addition to all other taxes of every kind now imposed by law or now imposed by this act, there is hereby levied a license or privilege tax upon each person, firm, corporation, agent, or officer engaged in the business of manufacturing and selling hydroelectric power in the State of Alabama, for the privilege of engaging in such business; said license or privilege tax shall be due and payable in advance on the first day of October of each year and shall be in a sum equal to two-fifths of a mill upon each kilowatt-hour of hydroelectric power manufactured and sold during the preceding calendar year.'

"The said revenue law of Alabama, approved July 22, 1927, also provides that in case said tax is not paid when due, then 15 per cent. thereof shall be payable thereon as a penalty for the same not having been paid by the time it was due under said revenue law; and said act of the Legislature of the State of Alabama hereinbefore referred to provides that said tax shall be due and payable on, to wit, November 1, 1927. * * * That there has been demanded of the said United States the tax due by said Government on 429,311,000 kilowatt-hours of hydroelectric power sold by said Government to the Alabama Power Company, a corporation; and that said Government has failed and refused to pay said tax, and that said tax, not having been paid when due, the said Government is liable for said tax and the interest thereon since November 1, 1927, and 15 per cent. thereof as a penalty thereon for the failure to pay said tax when the same became due under the provisions of said act of the Legislature of Alabama, approved July 22, 1927.

"That during the calendar year 1926 the total amount of hydroelectric power generated by the United States at the power plant referred to in Paragraph III hereof was 432,629,000 kilowatt-hours, of which the United States used, in operating locks in aid of navigation and for lighting and power at its plant, 3,318,000 kilowatt-hours, and of which 429,311,000 kilowatt-hours were sold to the Alabama Power Company, as set forth in this amended petition.

" * * * That while the said United States may have constructed said Wilson Dam in the said State of Alabama and a hydroelectric plant at said dam in connection therewith, and may have manufactured thereat hydroelectric power in pursuance to the national defense act (section 79, title 50, of the United States code; section 124 of the national defense act), said United States, after having manufactured said hydroelectric power, did sell the same to a corporation or an industry carried on by private capital.

" * * * That the total amount of money claimed of the United States in this suit is a tax due for the privilege exercised by said United States, of manufacturing and selling 429,311,000 kilowatt-hours of hydroelectric power sold to the Alabama Power Company, a corporation carried on by private capital, which said privilege tax amounts to approximately $173,051.60, together with interest thereon at 8 per cent. per annum, and the further sum of 15 per cent. thereof as a penalty thereon due on account of the failure or refusal of the United States to pay said tax when due, that is to say, November 1, 1927."

It will thus be seen that the Secretary of War leased a certain surplus amount of the gross electric current produced by this plant to the Alabama Power Company, an Alabama corporation, the balance being used by the government for its own purposes. The state of Alabama by statute levied and attempted to collect a tax on this surplus of the gross amount of the current produced, on the basis of a sum equal to two-fifths of a mill upon each kilowatt-hour of current supplied to the Alabama Power Company. It was a direct tax on a portion of the gross production of the plant measured by the amount of current supplied to the Alabama Power Company. The government refused to pay the tax, and the state of Alabama is here asking for a judgment for the amount of the tax, with interest and a penalty for failure to pay.

█ The question is, Did this statute of the state of Alabama impinge upon the constitutional rights of the United States?

A tax on property is seen to be a tax on the thing called ownership, which is merely a person's legally protected interest in the thing owned.

We are of the opinion that a state cannot legally tax the sale or the proceeds of a sale of its property by the United States government, and that is what the state of

Alabama has attempted to do in this case. And further:

■ First. That in the exercise of its constitutional power the United States has the right, as Congress may deem proper, as a means of carrying into effect its constitutional powers, without being retarded, impeded, or burdened by acts of the states, to purchase property (Osborn v. United States Bank, 9 Wheat. 738, 867, 6 L. Ed. 204; Western Union Telegraph Co. v. Texas, 105 U. S. 460, 26 L. Ed. 1067; Van Brocklin v. Tennessee, 117 U. S. 151, 6 S. Ct. 670, 29 L. Ed. 845; Ohio v. Thomas, 173 U. S. 276, 282, 19 S. Ct. 453, 43 L. Ed. 699; Northwestern Insurance Co. v. Wisconsin, 275 U. S. 136, 48 S. Ct. 55, 72 L. Ed. 202; Panhandle Oil Co. v. State of Mississippi ex rel. Knox, 277 U. S. 218, 221, 48 S. Ct. 451, 72 L. Ed. 857, 56 A. L. R. 583); to hold and possess property (Van Brocklin v. Tennessee, supra; Clallam County v. United States, 263 U. S. 341, 344, 44 S. Ct. 121, 122, 68 L. Ed. 328; Lee v. Osceola Improvement District, 268 U. S. 643, 645, 45 S. Ct. 620, 69 L. Ed. 1133; and New Brunswick v. United States, 276 U. S. 547, 48 S. Ct. 371, 72 L. Ed. 693); and the right to sell its property (Choctaw, O. & Gulf Railroad Co. v. Harrison, 235 U. S. 292, 35 S. Ct. 27, 59 L. Ed. 234; Indian Oil Co. v. Oklahoma, 240 U. S. 522, 36 S. Ct. 453, 60 L. Ed. 779; Gillespie v. Oklahoma, 257 U. S. 501, 505, 42 S. Ct. 171, 66 L. Ed. 338; and Jaybird Mining Co. v. Weir, 271 U. S. 609, 612, 613, 46 S. Ct. 592, 70 L. Ed. 1112).

Aside from the express authority given by the National Defense Act (see footnote) to sell and dispose of "any surplus" of the "products" of the plant, the right of the government to dispose, by lease or otherwise, of the "products" created by the building of the dam, erected for a public purpose, was a constitutional right and the exercise of it a means of carrying into effect the constitutional power. The disposal of the "products" could be by lease or otherwise; a lease may be a sale of a right when a price is paid.

■ Second. That the right to sell property which it owns is the correlative of the right to buy. They mutually imply and involve one another. The right to tax one involves the right to tax the other, i. e., the purchase as well as the sale. To say that a state can tax the right to buy or the proceeds of a purchase by the government for its legal uses and the right to sell or the proceeds of a sale by the government of what it had purchased and owned would put the United States government at the mercy of the state. It may be noted that this section, 124 (50 USCA § 79), authorizes the purchase of materials. This right of purchase could not be interfered with by a similar tax on the dealer, say, in lumber or oil, who sold these materials to the United States for the purposes of this plant. See Panhandle Oil Co. v. United States, supra. The same principle must apply to the sale of materials or the products of their use, and the reach of protection for the sale must stretch as far as the purchase of materials.

■ Third. That no state can, by taxation or otherwise, in the exercise of its rights, in the smallest degree limit, diminish, qualify, or interfere with the exercise of these rights of the United States government, and that a statute having this effect is unconstitutional and void as to the United States. McCulloch v. Maryland, 4 Wheat. 316, 420, 4 L. Ed. 579.

The doctrine of the immunity from taxation of the property and instrumentalities of the United States government is that, if such burdening be permitted, it might result in crippling the revenues of the government upon whose agency or instrumentality a tax was placed. The very condition thus presented prevents the power to tax from existing, and this in view, further, of the paramount nature of the governmental function under which the property proposed to be taxed is held and exercised. No other doctrine has ever been held or approved by the Supreme Court.

■ Fourth. That if the constitutional power exists, Congress has authority to select the means and methods of carrying it into effect and to create such agencies to that end as it may see fit. In the case of Clallam County v. United States, supra, it was held that Congress could go so far in this direction as to incorporate and formally erect a new personality and corporation under the laws of the state of Washington for its convenience in accomplishing its ends, and that taxes levied by the state and county upon land and other physical properties of the corporation were unconstitutional and void.

■ Fifth. That where Congress has passed a statute authorizing the doing of a certain thing and the creation of a certain agency and given full authority to the Executive to accomplish that purpose, and thus expressed its opinion of its constitutional right so to do, this court will not undertake to deny the constitutionality of its action.

■ Sixth. That where Congress has taken the action just stated it was taken in the exercise of a public function, and the things to be done and the agencies erected in pursuance thereof were public acts and public agencies and cannot by any refinement or nice distinctions be treated as or converted into private agencies and thereby be subjected to state taxation. This being true, it follows that any sales made of property purchased or owned in connection with the creation of said agencies or the proceeds of the operation thereof were made in the performance of a public function, in the transaction of public business, and cannot by any illogical twist or the use of a false face be made to appear as private business.

■ Seventh. That no agency created by Congress as a means of exercising its constitutional functions can be taxed by a state, for the reason that it is an instrumentality of the United States.

It cannot seriously be disputed that the Wilson Dam and the plan for generating electric current were such an agency and such an instrumentality.

■ Eighth. That where an agency is created and all of the agent's property is acquired and owned by the United States for the purpose of exercising a constitutional right, the taxation of its property or the sale of its property or the products thereof is a taxation of the means employed by the government to perform a constitutional function (Weston et al. v. Charleston, 2 Pet. 449, 7 L. Ed. 481; Choctaw O. & Gulf Railroad Co. v. Harrison, supra; Indian Oil Co. v. Oklahoma, supra; McCulloch v. Maryland, supra; Gillespie v. Oklahoma, supra), and so in this case the tax on the sale of current to the Alabama Power Company is a tax on the means and the agency employed by the United States to perform a constitutional function. The tax here is direct on the amount of power sold specifically and in terms authorized by the act creating the agency. Section 124 of the National Defense Act, 39 Stat. 166, 215 (50 USCA § 79), authorizes the sale of "any surplus * * * not required" for governmental use, upon such terms as the President may prescribe.

As stated, Congress assumed the constitutional power to direct, and the President was directed to do the very thing that was done in this case; that is, sell the "surplus" under discretionary conditions. The act here by the government is spoken of as a lease, but it is clearly a sale of electrical current. If the state of Alabama has the right to tax a part of this gross current or product, it has a right to tax the whole of it in case the government in the future should wish to sell or to lease the plant. Congress has the constitutional power to either lease or sell, and in case it should do so the proceeds of the sale or lease of the products of the plant could not be taxed any more than the proceeds of the sale of the plant itself could be taxed. This plant was bought and paid for by the government, not as already constructed, but in the sense that it paid for its construction, and the output of the plant, its product, is as much and in the same sense the property of the government as the plant itself. It has the same right to sell one that it has to sell the other, free from interferences by a state. Van Brocklin v. Tennessee, supra, and oil and mineral cases cited supra.

■ Ninth. The means and agencies which Congress may select for the performance of its constitutional functions must necessarily vary and expand to suit the expanding social, economic, and political life of the people of the country.

The elastic character of the Constitution is conceded. As a piece of governmental machinery it was not intended as a stationary engine but rather as an adjustable motor. As the life of a country does not and cannot stand still, its Constitution must yield and expand to meet its changing needs if it is to accomplish its mission of fostering and guarding that life; acting always within the confines of and with due regard to its granted and limited powers, and making suitable adjustments in the maintenance of its relations to the rights of the states as well as the welfare of all the people.

To suffer state legislation to disregard the Constitution would soon make it a dead letter and destroy its efficiency, and so the courts must be the balance wheel in the machinery of the Constitution. To admit this power in a state or permit its exercise would make a fatal breach in the walls of the Constitution. The power of the courts must be so exercised as to maintain the paramountcy of national power within the sphere of its competence, with due regard to the reserved sovereignty of the states. Neither must be unduly favored or promoted.

Within the circumference of its powers, the Constitution was intended to and must meet and fulfill the governmental requirements demanded by the change and growth of a vibrant and vigorous people, as its economics, sociology, and politics from to time

embody the facts and form the problems of its national life. So a part of what is the domain of so-called private business occupied by the activities of private persons to-day for private profit may in the interest of the general welfare of the people of the United States become by action of Congress occupied as public business to-morrow by the government. But in invading what was formerly the domain of private business and assuming regulation or control of business activities which were formerly conducted only by individuals does not make the Government's action in so doing private business or place it in a position of conducting a private business. Whenever it lawfully enters a new field and creates a new agency in the performance of its constitutional functions, the business covered by that agency and its operations at once becomes a public business, created and carried on in the exercise of a public function. The mere fact that it may be an invasion of the domain of private business does not change its public character when assumed by the United States. This is exemplified in the case of the Post Office money order system, the parcels post system, the postal savings banks, the United States Shipping Board Emergency Fleet Corporation, the Panama Canal, the Alaskan Railroad, the Insular Barge Company, a corporation, from all of which the United States receives an income from charges, and the twenty or more canals, most of them intrastate, which the government has erected and operates and for the use of which canals, as in the case of the Panama Canal, it could, if it saw fit, exact a toll. Is it to be said that, in case it did, the state where the canal was located could tax the gross receipts from such tolls?

More than this, the government by lease sells the output of its mineral lands, its oil lands, its timberlands, its grazing lands, and in erecting dams in the aid of navigation or irrigation, or flood prevention, it sells sometimes the water power from these dams, as is proposed in the Boulder Dam, to states, municipalities, and private persons. Are the gross proceeds of these sales or leases taxable by a state? The Insular Barge Company, a corporation, owns numerous barges and wharves and conducts a general shipping business on the Mississippi River, and is "a separate personality" and corporation, but owned and operated by the government in aid of navigation. Can its gross receipts be taxed by a state?

The United States every year sells surplus material or used and unnecessary property which it owns, through its different departments. It sells its antiquated and useless ships, as it does its antiquated surplus and useless arms and military equipment, furniture, and personalty, as well as realty owned by it. It has but recently been engaged in an extensive sale of great quantities of surplus and useless material accumulated in the operations of the World War, and through the medium of the Shipping Board has disposed of a large number of useless ships. Through that board it is at present constructing new ships or contributing to their construction and leasing and operating those that it owns. Is it to be said that a state could tax the proceeds of the sale of all of these materials?

If what is contended for by the petitioner is a sound doctrine, it is not difficult to see how the future activities of the United States government will be limited and the untrammeled and free use of agencies which it has created for governmental purposes in the exercise of constitutional power interfered with and possibly frustrated. The government is just entering upon new fields of industrial endeavor which are bringing and will bring great change in the social, economic, and political life of the people, viz., the use and occupation of the air by the radio and aviation. Already the policy of the government's taking full control of these operations in the air is being advocated, and it is not among the things impossible that this policy may not in the future be adopted. The question of government ownership and operation of public utilities is seriously advocated by many thoughtful and patriotic persons. Once concede that the United States can engage in private business as a private personality, once throw open the question for decision as to whether the United States in particular cases is or is not engaged in private business, and the field of litigation is limitless. To concede the right of a state to tax or in any way interfere with the performance of a governmental function under the sophistical plea that it is private business would be to open up a field for a general frustration of the United States government in the performance of its constitutional functions by any or all of the states of the Union.

The proposition that the United States by engaging in business ordinarily conducted by individuals thereby incurs the liability of a private individual is fallacious. Under the Constitution, the United States has no authority to transact anything but public business as a governmental agency—all its acts

are of a governmental character. Because it chooses, as a means of effectuating its constitutional powers, to occupy a place in business an individual could occupy with equal propriety, it would nevertheless be acting in its public and governmental character. It would be performing a function strictly belonging to its limited sovereignty as a government in its strictly governmental capacity; performing a duty of a public character imposed upon it for the public benefit. It cannot acquire and manage property or voluntarily exercise rights except for a public purpose. Its legitimate acts are public acts, not private acts. It possesses but one kind of power, namely, governmental and public, to be used only and solely for public purposes, and whatever it does in the exercise of its powers is of this character and by virtue of its granted powers of sovereignty. Whatever property it holds is public property. It cannot lawfully purchase, hold, or use property in the capacity of a private individual. Its powers were granted for public purposes exclusively and belong to it in its public character. The powers were not given for the purpose of private advantage or emolument. To so use them would be an ultra vires act by its agents, for which the United States could not be taxed.

In the case of South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737, in holding that a state could engage in private business, it clearly was not intended to sweep away the ancient landmarks and the immunity from taxation of government instrumentalities of the United States by a state or to endow a state with the power to divest the government of the United States of any of its lawful attributes. The United States has no reserve powers of sovereignty. The states have.

The question cannot be disposed of by the mere statement "that private business is private business." This is as satisfactory and convincing as saying that "public business is public business." Private business is private business only so long as it remains private business; that is, based upon the rights and activities of a private individual. It ceases to be private business and becomes public business when the things done are done in the exercise of a public function or through a public agency. To speak of the United States being engaged in private business is of a kind with speaking of private international law, albeit it has so been spoken of by certain writers, or the private judg-ment of a court, or a private arrest by an officer.

The United States is a government of limited and enumerated powers. There is no specially granted or implied power to engage in private business as such. In selecting the means to carry out and perform its constitutional powers the government may invade the field of what is called private business, and to the extent that it does it is performing what it can only perform—a public function. A state by reason of its original and reserved sovereignty may engage as a separate personality or corporation in what is called "private business," and thus subject itself to certain liabilities. But when the United States enters the field of so-called private business even as a separate personality or corporation, in order to effectuate certain of its granted powers, its action in so doing is a public act and it is not liable to be treated as a private individual and be subjected to taxation as such. Clallam County v. United States, supra. The court in that case said: "The incorporation and formal erection of a new personality was only for the convenience of the United States to carry out its ends." That is to say, it could invade the domain of private business in the form of a private corporation for its own convenience and to carry out its own ends, yet it would not be conducting business in a private capacity but as a governmental agency and so be exempt from taxation.

In the Chandler-Dunbar Case, 229 U. S. 53, 73, 33 S. Ct. 667, 676, 57 L. Ed. 1063, the court said: "If the primary purpose is legitimate, we can see no sound objection to leasing any excess of power over the needs of the government." See, also, to the same effect, Waters v. Phillips (C. C. A.) 284 F. 237, 239.

There can be no logical distinction between the principle involved in these two cases and the instant case as far as the question of the right of the government to dispose of water power or electrical current is concerned. The tax levied by the state of Alabama clearly interferes with, impedes, and burdens the exercise of this right and is therefore unconstitutional.

In McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L. Ed. 579, the court said: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited * * * are constitutional."

904

The fact that this plant was located within the jurisdiction of the state of Alabama is of no significance. The United States government did not go into the state of Alabama and build this plant. It was already there. It had a constitutional right to be there. It was placed there by the Constitution and with the consent of the states. It has always been and is in every state of the Union and wherever its flag has a right to fly. Its authority is ubiquitous and, within the limits of constitutional powers, is paramount in every state of the Union. It has no fixed residence or domicile from which it goes forth into the different states to perform its functions and conduct its business. Within the physical bounds of its sovereignty, there it is and there it has been.

The demurrer should be sustained and the petition dismissed, and it is so ordered.

BOOTH, Chief Justice, and WILLIAMS and LITTLETON, Judges, concur.

GREEN, Judge (concurring in the result).

I concur in the result of the foregoing opinion, but on somewhat different grounds. On account of the importance of the principles which have been considered and discussed on the submission of the case and in view of the fact that the decision may be a precedent in other similar cases, I have deemed it advisable to express my opinion thereon at some length.

The federal government undoubtedly has the right to acquire, own, and use property independently of its war powers, but this right and power is not derived from any provision in the Constitution, for the Constitution makes no reference to it. It has this power, as I think, because it is one of the inherent rights and attributes of sovereignty. In Van Brocklin v. Tennessee, 117 U. S. 151, 154, 6 S. Ct. 670, 672, 29 L. Ed. 845, cited and relied upon in the majority opinion as a leading case, the court said: "The United States, for instance, as incident to the general right of sovereignty," may do certain things; and it adds: "So the United States, * * * may acquire and hold real property in any state, whenever such property is needed for the use of the government in the execution of any of its powers." In fact, the right and power to own and hold property is such an essential element of sovereignty that no government could be successfully carried on without it. The right and power to own, however derived, necessarily includes the right to use and the right to sell, for no ownership would be complete without these rights, and if the government has the right to use its property, it necessarily has the right to sell this use, or, in other words, to lease the property. These powers so necessary to every government are obviously a governmental function, and as such cannot be impaired or controlled by state taxation.

Having stated these principles upon which I think nearly everyone will agree, it becomes necessary to notice the allegations of the petition which are, so far as necessary to be stated for the consideration of the point next to be taken up, "that the said United States has sold to the Alabama Power Company during the calendar year of 1926" a certain amount of hydroelectric power developed by the Wilson Dam, and "that since October 1, 1927, and continuously up to and including this date, said United States has exercised the privilege of manufacturing and selling hydroelectric power in the State of Alabama to the Alabama Power Company." Whether the state Legislature recognized its limitations in the way of taxation or not, the state statute (Laws 1927, p. 141, § 2–D) upon which the case of the state depends provided that "* * * there is hereby levied a license or privilege tax upon each person, firm, corporation, agent or officer, engaged in the business of manufacturing and selling hydro-electric power in the State of Alabama for the privilege of engaging in such business. * * *" This provision was followed by one with reference to the rate of the tax, which does not need to be considered.

It will be observed that the tax is on the privilege of engaging "in the business of manufacturing and selling hydroelectric power," but the allegations of the petition show that the United States did not engage in such business. What it did was to sell electric power produced by the Wilson Dam to a single corporation. Whether the electric current was sold in separate lots, or whether a continuing contract was made which would in effect be a lease, does not appear from the petition nor, as I think, is it material. In neither case would the government be engaged in the business of manufacturing and selling hydroelectric power any more than a farmer would be engaged in the grain business because he sold at various times different kinds of grain, which were the products of his farm. If the word "business" was used in the statute in its commercial sense, as I think it was, the government was not making a busines of creating and selling power. I think it is clear that the acts of the government

alleged and set forth in the petition do not come within the provisions of the Alabama statute.

The conclusion above stated would by itself dispose of the case, but for the reasons given at the beginning of this opinion I deem it advisable to state my views on some other points where my conclusions are not in harmony with the majority opinion.

I am unable to agree to the statement in the majority opinion that the sale of hydroelectric power was authorized by the act under which the Wilson Dam at Muscle Shoals was constructed. It seems to me that a reading of its provisions shows clearly that in a general way it was enacted for war purposes, and specifically to enable the government to produce nitrates which are so necessary in modern warfare. For this purpose the President was authorized to construct dams, locks, etc., "as in his judgment is the best and cheapest, necessary or convenient for the generation of electrical or other power and for the production of nitrates or other products needed for munitions of war and useful in the manufacture of fertilizers and other useful products." The third paragraph of section 124 (50 USCA § 79), from which section the part above quoted is taken, provides that "the products of such plants shall be used by the President for military and naval purposes," and that "any surplus which he shall determine is not required shall be sold and disposed of by him." All of these provisions were plainly within the constitutional authority of Congress, and it is equally true that they provide for the exercise of a governmental function, namely, preparation for war, but I am unable to find anything in the act which either authorizes or shows it was contemplated that use should be made of the power produced for any other purpose except that of the government itself. The act authorized the construction of "power houses, and other plants * * * for the production of nitrates or other products needed for munitions of war and useful in the manufacture of fertilizers." The President was further authorized to use "the products of such plants * * * for military and naval purposes, * * * and any surplus which he shall determine is not required shall be sold." Where the wording of the act is considered, I think it is clear that the word "products" refers to nitrates, a product necessary for the manufacture of high explosives and extremely useful as a fertilizer in the way of increasing the amount of food crops grown, which was also necessary in time of war. In this connection it should also be said that, when the National Defense Act came before Congress, nothing was said either in the committee report or in discussion of the measure with reference to the production of hydroelectric power for sale. I do not, however, consider this point as important because, Congress having authority to authorize the construction of the dam, and the Government having acquired the dam as its property, the United States would, I think, without any provision in the act, have the powers concerning its sale and use which have been herein above recited. On the other hand, if, in the use made of the dam, it went beyond its governmental powers, no provision in the act would add to its authority.

In the majority opinion it is stated that private business "ceases to be private business and becomes public business when the things done are done in the exercise of a public function or through a public agency." If by this is meant that acts done for the public benefit or through a public agency by the national government thereby become a governmental function, I am unable to concur. To my mind, whatever is private business when done by a state would be private business when done by the United States. Leaving out the question of whether the government may carry on what in the strict sense of the term is private business, the question of whether such business, if done, is taxable must depend upon the powers conferred upon the government by the Constitution or existing by reason of the fact that the Constitution has created a sovereignty with certain inherent powers; but in all cases, as it seems to me, some governmental function must be performed in order that the exemption from taxation may be maintained.

It is said that the government has in many instances engaged in private business, such as the operations of the Post Office Department, the Emergency Fleet Corporation, the Panama Canal, the Alaskan Railroad, and the Insular Barge Company, together with a number of government canals for which the government could charge tolls if it desired, and it is asked whether a tax could be levied by a state upon the business thus carried on or upon the receipts from such operations. Certainly not, but the reason is plain. All of these acts are authorized by special provisions of the Constitution. The Constitution authorizes Congress to regulate commerce with foreign nations and between the states, and to regulate in the sense intended means, not merely to con-

trol, but also to foster, maintain, or make more efficient by any appropriate means. Second Employers' Liability Cases, 223 U. S. 1, 47, 48, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44. Congress also has complete power over the territories. In all of these matters, by giving Congress authority to act, the Constitution made such acts a governmental function of the government of the United States, and this, as I think, shows that these matters are exceptions to the general rule.

Clallam County v. United States, 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328, was, as said in the majority opinion, a case which held that Congress might create a corporation for convenience in carrying out certain governmental functions, and that a tax levied by the state upon the property of the corporation was unconstitutional. But this is just another way of saying that when the federal government makes use of some instrumentality for carrying on a governmental function, which in the case at bar was obtaining materials for use in war, the instrumentality stands in the same position as the government itself, and cannot be taxed. An examination of the decision will show that the Supreme Court confined its ruling to cases where some governmental function was being exercised and where the use of public property was confined to such purpose. The court called attention to the fact, not only that the corporation taxed had been organized as an instrumentality for carrying on the war, but when the war was over its work was stopped, except so far as was necessary to go on in order to wind up its affairs, and that whatever assets were realized would go to the United States. The same principle that gave the government the right to use this corporation and its property for war purposes gave the government the power to close out and dispose of the property which it held. In so doing a governmental function was being exercised.

In the case of South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 117, 59 L. Ed. 261, 4 Ann. Cas. 737, the Supreme Court said that, " * * * whenever a state engages in a business which is of a private nature, that business is not withdrawn from the taxing power of the nation"; and also " * * * that the license taxes charged by the Federal government upon persons selling liquor are not invalidated by the fact that they are the agents of the state, which has itself engaged in that business."

I think the principle which is involved in this statement applies equally to activities on the part of the national government, and if the national government was engaged in a business of creating and selling electric power for all persons who should apply therefor and not simply disposing of surplus power for which it had no use and which would otherwise go to waste, by a sale or lease to a single company, that a very different situation would be presented, for, in my judgment, it would not be carrying out any governmental function or doing any act which was necessary in order that a governmental function might be fully exercised. I am unable to see how such action would be necessary in order that the government might manufacture nitrates or prevent waste of public property. It is quite clear under the decision in the South Carolina Case, supra, that a state could not so act without making itself subject to federal taxation, if a tax was imposed, and in this connection it ought to be said that, while there was a dissenting opinion in the South Carolina Case, the doubt in that case arose, as I understand the dissenting opinion, not as to the general principle that the state could not engage in private business and claim exemption from the taxation, but from the fact that in that particular case the state was engaged in the execution of a police power and thus carrying on a public and governmental function, as it had the undoubted right and power to do. It has been generally considered that the same limitations applied to both the federal and state governments in that neither could tax the property or instrumentalities of the other. Numerous Supreme Court decisions could be cited which have so held in effect, and in some cases almost literally. If the government can carry on a private business merely because it uses its own property or some instrumentality created for the purpose of carrying on a governmental function, this time-honored principle must be laid aside and a conclusion reached that there is one rule for the federal government and a different rule for the state governments. Let us see what would be the result.

The government has manufacturing plants, such as the big gun factories at Watertown, Watervliet, and Rock Island. If work for these plants was slack or entirely lacking, could the government sell its power or use its machinery, when adaptable for the purpose of entering into the commercial field, in competition with private industry without in any manner being subject to a

tax? The government has at its navy yards at Brooklyn and Mare Island, Cal., plants fully equipped for the construction of steamships of the largest size. In these plants large sums of money have been invested. They are used for the repair and construction of war vessels or other government boats or ships. The demand for large vessels is not continuous, and for considerable periods of time little use is made of the construction features of these navy yards. As the overhead occasioned by these plants goes on continuously, the government could probably lessen the cost to the taxpayer if these yards were used in the construction of merchant vessels in competition with private yards. The plant having been constructed for a governmental function, could the government carry on this private work without being subject to any tax? The government owns dredges used in aid of navigation. When these dredges are idle, could the government put them at work on private contracts and be exempt from tax? They were bought or constructed to perform a governmental function. So also the government may construct, if it sees fit, bakeries at its cantonments for the purpose of supplying its Army with food. If the troops are moved away from the cantonment, could the government continue to buy flour, operate the bakery, and sell its products to private individuals in the neighborhood of its location and be protected from taxation? I think not, although in all these hypothetical cases the government would be using an instrumentality created for a governmental purpose; but these questions, as it seems to me, must be answered in the affirmative if the rule in favor of the federal government is as broad and comprehensive as the majority opinion implies, and in this I am unable to concur.

It is sometimes said that a distinction can be found in the fact that the federal government has only powers which are expressly conferred upon it by the Constitution or those which, as I have stated, are inherent in the sovereignty which was created by the Constitution, while the states have such powers as are not reserved to the federal government by the Constitution. But this, as it seems to me, does not alter the fact that, as long as either is acting within the limitations so prescribed, it is exercising a constitutional right and power. In my opinion the principle that both the national and state governments are subject to the same limitations with reference to taxation should be maintained.